**AMERICAN STANDARD, INC.,**
**Plaintiff,**

v.

**Melvin R. LAIRD et al., Defendants.**

**Civ. No. 2653–70.**

United States District Court, District of Columbia.

Feb. 3, 1971.

Robert X. Perry, Jr., Washington, D. C., for plaintiff.

Wayne S. Bishop, Washington, D. C., for defendant Texas Instruments, Inc.

Robert S. Rankin, Jr., Asst. U. S. Atty., for defendants Laird and Seamans.

### OPINION

WILLIAM B. JONES, District Judge.

This is an action to declare null and void and to set aside a contract which plaintiff alleges was unlawfully awarded to Texas Instruments, Incorporated by the United States Air Force. A preliminary injunction is sought to restrain defendants from any further performance of the contract. Plaintiff further seeks a mandatory injunction requiring Laird and Seamans to award to it the contract upon invitation for bids No. F33657–70–B–0166.

In addition to its motion for a preliminary injunction, plaintiff has filed a motion for a summary judgment. All three defendants have filed cross mo-

tions for summary judgments in their favor against plaintiff. Each defendant also filed an alternative motion to dismiss the complaint.

The three defendants in connection with their motions for summary judgments have filed a joint statement of material facts as to which they assert there is no genuine issue. The plaintiff has not filed a "statement of genuine issues" or any statement asserting that defendants' statement of facts are in good faith controverted. Thus the Court may assume that the facts as claimed by the defendants are admitted to exist without controversy. Rule 9(h), Local Rules, United States District Court for the District of Columbia.

Plaintiff in support of its motion for summary judgment also filed a statement of facts as to which, it asserts, there is no genuine issue. Defendants did not controvert plaintiff's statement. Both statements are for the most part substantially the same.[1]

A. Defendants' joint statement of material facts as to which there is no genuine issue asserts:

"1. The case here concerns the Air Force award of a contract for the manufacture of an advanced instrument landing system. An instrument landing system (ILS) is an electronic system installed at airports to guide aircraft along a predetermined path to a landing approach. Such systems are designed to make safer the approach of the aircraft to the airport (Govt. Exh. 1).[2]

"2. For more than 15 years, the Air Force has had in use an ILS system that is termed 'Performance Category I and is capable of guiding an aircraft to a decision height of 200 feet, at which point the landing is aborted if the pilot cannot see the runway (Govt. Exh. 1).

"3. Early in 1969, the Air Force decided to purchase a quantity of ILS in Performance Category II, which would guide the aircraft to a decision height of 100 feet (Govt. aff. of Carle, p. 1). This decision was made because the Category I systems in use were 15 to 20 years old, were difficult and expensive to maintain, did not possess the reliability or stability desired to be achieved, and were inadequate for use with the C-5A and C-141 aircraft as well as the larger commercial aircraft. The Air Force decided these factors justified its replacement of the Category I systems with Category II systems (Govt. aff. of Werdung, p. 1).

"4. The Air Force, in cooperation with the FAA [Federal Aviation Administration] then sought to determine what procurement method and requirements would be suitable to obtain the maximum competition among bidders capable of manufacturing a system which satisfied the government's severe accuracy and reliability requirements (Govt. aff. of Gobien, pp. 1–2, Carle, pp. 1–2, and Butts, pp. 1–2). Certain factors were given prime consideration. First, it was recognized that in prior ILS procurements substantial delays had occurred in delivery of systems because production difficulties had developed even though an acceptable paper design had been produced. This was due to the complexity of mating the various units into a total system which could actually perform. The government representatives concluded that in order to avoid such delays, it would require that a proposed bidder demonstrate an operating Category I system as a prerequisite for

---

1. Defendants do not dispute any factual assertion in plaintiff's statement but they contend that the factual assertions are incomplete to show all the facts relevant to the determination of the issues. Both defendants' joint statement and plaintiff's statement will be set forth at length.

2. References are made to the documents supporting the defendants' joint statement of fact. The exhibits and affidavits referred to are those attached by the parties to the preliminary injunction papers as well as those attached to the summary judgment papers. Affidavits are referred to by the party submitting them and the names of the affiants.

*bidding.* Second, because the contract would require a dual frequency localizer system which was an additional sophistication not commonly used, it was agreed that demonstration of such an operable system should also be required as a prerequisite to bidding. The government representatives agreed that because of the severe accuracy and reliability demands on these systems, and the importance thereof, that it was essential to determine that the proposed bidder had the personnel and technical ability to effectuate the manufacture of the total system. They further agreed that, as shown by past experience, the only way to determine a proposed bidder's ability to do so was to observe an operating Category I system with a dual frequency localizer system (Govt. aff. of Butts, p. 2, Gobien, pp. 2–3, Carle, p. 2).

"5. After making these determinations, the Air Force decided to procure the required systems under a two-step formal advertisement with a special bidder qualification clause to be included in the first step (Govt. aff. Carle, p. 2).

"6. Air Force procurements are conducted under the Armed Services Procurement Regulation (ASPR) Parts 1–30, either by formal advertising or by negotiations. The Department of Defense policy is to utilize formal advertising whenever possible in order to insure maximum competition. Two-step formal advertising is a valid form of procurement often used in procuring highly technical or complex items. It is specifically recognized in the Armed Services Procurement Regulations (ASPR 2–501) as follows:

> *2–501 General.* Two-step formal advertising is a method of procurement designed to expand the use and obtain the benefits of formal advertising where inadequate specifications preclude the use of conventional formal advertising. It is especially useful in procurements requiring technical proposals, especially those for complex items. It is conducted in two steps:

(i) Step one consists of the request for, and submission, evaluation, and, if necessary, discussion of a technical proposal, without pricing, to determine the acceptability of the supplies or services offered. As used in this context, the word 'technical' has a broad connotation and includes engineering approach, special manufacturing processes, and special testing techniques. When it is necessary in order to clarify basic technical requirements, manufacturing plan, or facilities to be utilized may be clarified in this step. Conformity to the technical requirements is resolved in this step, but capacity and credit, as defined in 1–705.4, are not.

(ii) Step two is a formally advertised procurement confined to those who submitted acceptable technical proposals in step one. Bids submitted in step two are evaluated and the awards made in accordance with Parts 3 and 4 of this Section.

Two-step formal advertising requires that the contracting officer work closely with technical personnel and that he utilize their specialized knowledge in determining the criteria to be used in evaluating technical proposals, and in making such evaluation. An objective of this method is to permit the development of a sufficiently descriptive and not unduly restrictive statement of the Government's requirement, including an adequate technical data package, so the subsequent procurements may be made by conventional formal advertising.

"7. The special bidder qualification clause was inserted in the step one procedure so as to limit bidders to those who could demonstrate in step one an operable Category I system with a dual frequency localizer station (Govt. aff. of Carle, p. 2). (This limitation was expressly approved by the Comptroller General in rejecting a protest by a different proposed bidder in this procurement. Pl. Exh. 5).

"8. The Air Force then formally announced the procurement and discussed the nature of the contract with interested contractors. On October 9, 1969, the Air Force initiated step one of the procurement procedure by issuing a Letter Request for Technical Proposals No. F33657–70–R–0166 ('LRFTP' herein) to six different firms. The LRFTP contained the following guidance along with the bidder technical qualification clause (Pl. Exh. 1, p. 3) :

3. This procurement will be accomplished in two distinct steps: (1) solicitation, submission and evaluation of detailed technical proposals *WITHOUT PRICING* to determine acceptability of the products offered, and (2) issuance of a formal invitation for Bids *ONLY* to those firms having acceptable technical proposals. Bidders who cannot comply with the attached Bidders Qualification Clause should not submit a Technical Proposal.

*BIDDERS TECHNICAL QUALIFICATION CLAUSE*

SOLID STATE INSTRUMENT LANDING SYSTEM

Technical proposals will be accepted only from those contractors who have manufactured and can demonstrate at an operating airfield a Solid State Conventional Instrument Landing System. The system must be comprised of at least the following components: A two-frequency (capture effect), dual equipment VHF localizer station; a single-frequency dual equipment UHF glideslope station; and a VHF Marker beacon station. The system must have successfully passed a flight check for Category I signal quality conducted by the FAA or other International Civil Aviation Organization recognized flight checking agency. Inspection of such a system by the Government will be conducted by Government engineers and technicians. The inspection will be part of the evaluation of technical proposals. Further information on the arrangement for such an inspection is contained in Attachment Nr. 1.

"9. The Air Force expected that at least three, and maybe five bidders would respond to the LRFTP. Air Force representatives were aware that Thomson-CSF (herein 'T-CSF') of France, a team of ITT [International Telephone and Telegraph] and Standard Telephone and Cable (herein 'ITT/STC'), and plaintiff were all manufacturers which could then meet the requirements. Two additional companies, AIL Division of Cutler-Hammer and Nippon Electric Company, were designing such systems and possibly could have completed the designs by the time of procurement (Govt. aff. Gobien, p. 3).

"10. In November 1969, T-CSF, a French Corporation, contacted TI about the possibility of teaming with it to present a technical proposal on this procurement (TI aff. of Dautremont, par. 3). T-CSF was a recognized international manufacturer of ILS systems and had already produced a Category II system with a dual frequency localizer system. It desired to compete in the United States market, but felt it needed to team with a United States company in order to comply with the Buy American Act and also for marketing purposes (*Id.*, par. 3). TI, an electronics firm, had been active in Airport Surveillance Radar systems, and had competed with T-CSF in other fields, but had never competed in the ILS field (*Id.*, pars. 6, 12).

"11. After a visit by T-CSF to the TI facilities and discussions into the possibility of joining forces for the instant procurement, TI and T-CSF agreed to team together for the presentation of a technical proposal. TI and T-CSF agreed to share jointly the costs in the proposal effort. They further agreed to continue to pursue the ILS market for at least one year if they were unsuccessful in the instant procurement, and to determine after that period what the long-range objective of the parties would be as a team in that market (TI aff. of Chandler, par. 3).

"12. After this agreement, TI and T-CSF representatives met for the purpose of preparing a technical proposal as a team. TI and T-CSF agreed that T-CSF would provide the technical personnel with the production experience necessary to direct the manufacture of the ILS, and its technological knowledge, design data, trade secrets, patent rights, manufacturing techniques relevant to the production of the equipment specified by the Air Force, and its other proprietary interests. T-CSF also agreed to furnish site surveys at TI, training instruction, maintenance instruction, technical personnel, data relevant to the manufacture of the systems, and to provide other design data as might be required to meet the Air Force specifications or future alterations therein. T-CSF also agreed to assume responsibility for the manufacture of equipment according to their instructions and to be responsible for the installation of systems purchased. In turn, TI agreed to act as prime contractor with total managerial responsibility. TI and T-CSF agreed that T-CSF would manufacture those critical assemblies or subassembles within its unique technological capability, and that other assemblies or subassemblies would be manufactured by whichever party could manufacture that item at the lowest cost. They further agreed that all equipment manufactured under the arrangement would bear the name of both companies (TI aff. of Chandler, pars. 4, 5).

"13. On December 3, 1969, TI and T-CSF advised the Air Force that it was TI's intention to bid on the procurement as the prime contractor under a team arrangement with T-CSF. This message informed the Air Force that the specific details of the teaming arrangement were still under discussion. During December 1969, T-CSF provided two engineers, necessary drawings, and design data to the proposal team in Dallas.

"14. On January 2, 1970, five proposed bidders submitted technical proposals to the Air Force: these were American Standard (plaintiff herein), Scanwell Laboratories, Airborne Instrument Laboratories (AIL herein), the team of TI/T-CSF, and the team of ITT/STC (Govt. aff. of Carle, p. 4).

"15. Prior to evaluating the technical proposals the government technical evaluation team, composed of Air Force and FAA representatives, departed on an inspection trip to observe and install ILS system site for each bidder. The purposes of this trip were: (a) to satisfy the evaluators that the existing system did indeed qualify under the terms of the restrictive qualification clause, (b) to allow the evaluators to observe firsthand a system of the type being proposed, and (c) to allow government technical personnel involved in the procurement to communicate with their counterparts in the bidders' organizations so as to eliminate misunderstanding early in the process (Govt. aff. of Gobien, p. 5).

"16. The TI/T-CSF's demonstration ILS, which had been designed and produced by team-member T-CSF and which had already achieved Category II performance, was inspected at Bretigny airfield south of Paris, France, on January 9, 1970. After the actual inspection was concluded, the inspection team met with representatives from both TI and T-CSF for a discussion of the method of procurement and technical issues. Representatives of TI informed the evaluators that an extensive discussion of the procurement method was unnecessary since TI would be the prime contractor, would build the system in the United States, and was thoroughly familiar with military procurements (Govt. aff. of Gobien, p. 5, Majewski, p. 2).

"17. At the January 9 conference, the relationship between TI and T-CSF was thoroughly discussed and the evaluation team was informed that TI would be the prime contractor, and that it intended to build as much of the system as possible in the United States. TI representatives said that to the best of their knowledge some critical or difficult to manufacture components and subassemblies would initially have to be imported

while TI developed the capability to manufacture them, but that this would comprise much less than the 50 percent of the system allowed by the "Buy American" act. [32 C.F.R. 6.100 et seq.] TI representatives further said that American parts would be used in all circumstances unless there was no American substitute for a particular foreign part. They informed the evaluators that TI was, along with T-CSF engineers, already in the process of substituting American parts for the existing foreign parts (Govt. aff. of Gobien, p. 6, Majewski, p. 2). TI representatives further expressed an awareness of the difficulties associated with manufacturing and installing an ILS, and stated they would rely heavily on T-CSF personnel in "americanizing" the system and in installing the system once it was completed (Govt. aff. of Gobien, p. 6).

"18. After the inspection tour ended, the government evaluating team returned to the United States to examine the technical proposals. The evaluating team found that the TI/T-CSF proposal was consistent with the information reported at Paris with regard to the relationship of the team members (Govt. aff. of Gobien, pp. 6–7, Majewski, pp. 2–3). The evaluation team was concerned from studying the technical proposal about the possibility that if some parts were built in France that metric tools would be needed for repair and maintenance purposes and that there may be difficulties in replacing these parts. The evaluation team issued deficiency reports to TI on these points. TI responded that the TI/T-CSF team had decided that only American parts would be used, that a 100 percent American spares (replacement parts) program would be used, and that no metric tools would be necessary. This response satisfied the questions raised in the deficiency report (Govt. aff. of Gobien, pp. 7–8, Majewski, pp. 3–4; TI aff. of Chandler, par. 11).

"19. From the time of the government inspection in Paris on January 9, 1970, through May 1, 1970, TI and T-CSF representatives met constantly to evaluate the manufacturing process in order to determine all details as to how the system would be manufactured and what the costs would be. Three T-CSF officials visited TI facilities in Dallas and Austin for approximately one week beginning on February 17, 1970, to analyze and compare cost information, including basic hardware costs, import duties, freight and insurance costs, with a view at arriving at the most competitive price consistent with desired performance. The team members agreed at these meetings that the best competitive price could be achieved if TI bore the major manufacturing function with T-CSF technical assistance and participation. Nevertheless, it was still contemplated that because of its superior technology T-CSF would manufacture some critical parts for the system. Thereafter, TI and T-CSF representatives engaged in continuous contacts, visits, and exchange of data, information, reports, drawings, designs and operating instructions designed to provide the necessary technical assistance and training for the team to manufacture, install, and service the ILS equipment involved under the Air Force procurement (TI aff. of Chandler, pars. 8–10, 12).

"20. The government evaluation team, after inspection of the systems and examination of the technical proposals, decided that the TI/T-CSF team and plaintiff had complied with the special "Bidders' Technical Qualification Clause" of the LRFTP and had submitted acceptable technical proposals. On May 1, 1970, the Air Force officially published the fact that these bidders had successfully completed step one of the procurement and were eligible to submit bids under step two. Of the other bidders submitting technical proposals, AIL and Scanwell had been previously eliminated because they failed to demonstrate achievement of the technology required by the Bidder Technical Qualification Clause, and the ITT/STC team was later

eliminated because its technical proposal did not propose the system desired (Govt. aff. of Carle, p. 4).

"21. The Air Force mailed out the second step solicitation on April 29, 1970. The solicitation was for a quantity of 29 ILS of the specified type, with option provisions enabling the Air Force and FAA to procure more of the systems from the contractor during a three-year period. Both plaintiff and the TI team thereafter submitted timely bids. On June 26, 1970, the bids were publicly opened and the TI bid was low (Govt. aff. of Carle, pp. 4–5, Werdung, p. 2; TI aff. of Chandler, par. 12).

"22. On the same day as the bid opening, plaintiff submitted a protest to the Comptroller General on several grounds, none of which are raised in this suit. On July 21, 1970, plaintiff added another ground to its protest: it protested, as it does in this suit, that TI was not a manufacturer as required by the Bidder Qualification clause. This protest was denied on September 3, 1970 (Govt. aff. of Carle, p. 5).

"23. In July 1970, the Air Force conducted a pre-award survey at the TI facilities in Texas. The results of this survey revealed that TI had the production capability, the requisite skilled personnel, and the program plan to perform team was aware that the coversion of the system to American parts was being the procurement. The pre-award survey performed by engineers from T–CSF as well as TI, that the conversion process was well along and would cause no problems, that T–CSF engineering personnel were present to assist in setting up the manufacturing processes, and that with the TI equipment and T–CSF technical help it appeared that the ILS could be produced more efficiently by TI due to the automated techniques employed by TI (Govt. aff. of Guthrie, p. 2, Majewski, p. 5).

"24. On September 4, 1970, the day following the Comptroller General's denial of plaintiff's protest, the Air Force awarded the contract to TI. On the same day, plaintiff filed the instant action and Judge Aubrey Robinson of this Court denied plaintiff's motion for a temporary restraining order.

"25. In the months immediately prior to the award, TI and T–CSF had been jointly and continuously involved in the task of preparing for the manufacture of the required ILS (TI aff. of Chandler, par. 13; Gentry, par. 4). Since the award, T–CSF has had technical representatives present at the TI facilities on a full-time basis, directing the start-up of the performance of the work to be done under the contract (TI aff. of Chandler, pars. 14–15, Gentry, par. 7). T–CSF personnel have performed all site surveys and will be responsible for the installation and testing of the system through final commissioning (TI aff. of Gentry, par. 8). As of November 6, the team had completed all make-or-buy decisions and 400 of the 600 necessary fabricated parts had been put into work (TI aff. of Gentry, par. 5).

"26. TI had earlier supplied the Air Force with a production schedule, in which TI provided an allowance for recovery time to correct any errors, deficiencies, or changes which might occur. As of November 6, 1970, TI had met all of the schedules on the production schedule and all data submissions submitted to the government had been approved (TI aff. of Gentry, par. 5)."

B. Plaintiff's statement of material facts as to which there is no genuine issue asserts: [3]

"1. On October 9, 1969, defendant Air Force issued a Letter Request for Technical Proposal No. F33657–70–R–0166 for specifically-described instrument landing systems.

"2. The Letter Request for Technical Proposal in a section entitled, 'Bidder's Technical Qualification Clause,' stated that technical proposals would be accepted only from 'those contractors who have manufactured and can demonstrate'

---

3. Plaintiff, unlike defendants, did not cite the documents supporting its statement of fact.

an instrument landing system meeting certain advanced specifications.

"3. Some of the reasons for the Air Force's decision to issue the bidder eligibility clause were (1) the short delivery schedule which the Air Force was requiring for this procurement; (2) the general background of delay which the Government had experienced in the delivery of instrument landing systems under other contracts; (3) the difficulties which the Government had experienced in obtaining instrument landing systems of adequate reliability and stability; and that experience had proved that only by testing an existing system could the workability of the system be proved.

"4. Plaintiff has satisfied the aforesaid eligibility requirement by manufacturing the required system and demonstrating this system to the Air Force's satisfaction.

"5. Thompson C.S.F. of France has satisfied the aforesaid eligibility requirement by manufacturing such a system and demonstrating it to the Air Force's satisfaction.

"6. Defendant Texas Instruments has not satisfied the eligibility requirement because it has never manufactured any kind of instrument landing system.

"7. Defendant Texas Instruments and Thompson C.S.F. have entered into a licensing agreement and a team arrangement. Under this licensing agreement Thompson C.S.F. will supply its drawings, diagrams, expert assistance, etc., and defendant Texas Instruments will do virtually all of the manufacturing of the systems in the United States.

"8. By January 2, 1970, both plaintiff and the Texas Instruments—Thompson C.S.F. team submitted technical proposals on this procurement and both were declared eligible bidders by the defendant Air Force. In June 1970 both plaintiff and defendant Texas Instruments submitted bids in the second step of this two-step procurement.

"9. On June 26, 1970, the bids were opened and it was announced that defendant Texas Instruments had submitted the lower bid and was subsequently awarded the contract on September 4, 1970.

"10. Two other bidders, Air Borne Instruments Lab, a division of Cutler-Hammer, Inc., and Scanwell Laboratories, Inc., were disqualified as bidders by the Air Force even though they were manufacturers of Instrument Landing Systems, because their systems did not contain a dual-frequency localizer which was one of the Air Force's requirements in the aforesaid eligibility clause. Scanwell Laboratories' System in addition was not solid state as was also required by the eligibility clause. Both of these companies have supplied the Government under other contracts with instrument landing systems.

"11. Plaintiff filed a formal written protest with the Comptroller General of the United States, demanding that no consideration be given the bid submitted by defendant Texas Instruments stating as one ground that defendant Texas Instruments was not an eligible bidder since it had never manufactured an instrument landing system as was required in the aforesaid eligibility clause. This protest was denied by the Comptroller General on September 3, 1970. Plaintiff's request for a reconsideration of this decision is still pending before the Comptroller General."

C. From the foregoing undisputed statements of material facts, the following clearly appear. Plaintiff was a technically qualified bidder. It had manufactured and was able to demonstrate at an operating air field a solid state conventional instrument landing system composed of at least the components described in the letter request for technical proposals circulated by the Air Force. Thompson C.S.F. (T–CSF) was another technically qualified bidder. Like plaintiff it had manufactured and was able to demonstrate at an operating air field a landing system. Indeed T–CSF had at the time of the letter request from the Air Force already manufactured and had in operation the category of landing system that the Air

Force desired—a system of a higher category than that theretofore manufactured by plaintiff. But defendant Texas Instruments (TI) had not manufactured a solid state conventional instrument landing system as described in the letter request for technical proposals or, for that matter, a landing system of any description.

Since TI had not manufactured a landing system as described in the Government's letter request for technical proposals, plaintiff contends the contract awarded in September 1970 to TI as prime contractor is invalid as violative of the Armed Services Procurement Regulations, which have the force of law. Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). Plaintiff having failed to obtain the contract has standing to sue. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970), Blackhawk Heating and Plumbing Co. v. Driver, D.C.Cir., 433 F.2d 1137 (1970).

Plaintiff asserts that TI failed to meet the basic technical qualification clause of the Government's letter request for technical proposals. As has been noted, that clause limited receipt of proposals from "contractors who have manufactured and can demonstrate at an operating air field" the described instrument landing system.[4] And the contract arrangements between TI and T–CSF do not bring TI within the eligibility clause according to plaintiff.

The question before the court is a narrow one, that is whether the contract arrangements between T–CSF (an admittedly qualified manufacturer of instrument landing systems) and TI makes the latter qualified to be awarded, as the principal contractor, the September 1970 contract in issue here.

That contract was awarded after a two-step formal advertising procedure was followed by the Air Force. Such a procedure is authorized by the Armed Services Procurement Regulations. 32 CFR §§ 2–501–2–503.2. "It is especially useful in procurements requiring technical proposals, especially those for complex items." 32 CFR § 2.501.

Under date of October 9, 1969 the Air Force issued its letter request for technical proposal in initiating the first step of the two-step procedure.[5] Responding to that request TI and T–CSF filed a joint proposal, which stated in part:

We are pleased to forward this, Texas Instruments, Incorporated and Thompson–CSF, joint proposal * * * for a Solid-State Instrument Landing System * * *.

Texas Instruments is prime bidder with total managerial responsibility for this program. The unified team arrangement with Thompson–CSF provides an associate contractor with extensive ILS experience. * * * Thompson–CSF will be technically responsible to Texas Instruments for upgrading the commercial equipment to meet the requirements of Reference (A) [letter request for technical proposal].

The joint proposal made known that T–CSF would participate in all phases of the program to the extent allowed by the "Buy American Act" (41 U.S.C. §§ 10a–10d, 32 CFR § 6–100 et seq.) and that its prime contribution would be technical responsibility and manufacture of critical subassemblies and installations. TI, according to the joint proposal, would maintain strong managerial jurisdiction over the "entire program", while T–CSF would maintain strong jurisdiction over all technical aspects. TI stated it would assure maximum use of competent T–CSF engineers who would inspect work done at TI facilities, while TI would monitor work at T–CSF "to

---

4. All parties recognize authority in the Air Force for including the basic technical qualification clause in its letter request for technical proposals. Section 1–903.3 Armed Services Procurement Regulations, 23 CFR § 1–903.3.

5. Under date of November 12, 1969 the letter request was amended which among other things changed the date for receipt by the Air Force of technical proposals from November 24, 1969 to January 2, 1970.

assure compliance with quality and reliability requirements." Assemblies and subassemblies built by T–CSF would be shipped to TI and would be incorporated into the system. T–CSF would be responsible for the first five installations of landing systems at air fields while TI would assume responsibility for the sixth and subsequent installations.

Following receipt of TI/T–CSF joint proposal as well as the proposals of plaintiff and three other proposed bidders, the government technical evaluation team inspected the installed landing system site of each proposed bidder. These inspections were in accordance with the terms of the latter request for technical proposals. The T–CSF installed system was at an air field in Paris, France. As authorized by the Armed Services Procurement Regulations (32 CFR § 2–503–1(a) (7)), the government team while in Paris discussed thoroughly with TI and T–CSF their relationship and the part of the work each would engage in, as is more particularly described in the undisputed facts heretofore stated. Thereafter, the government evaluation team examined TI/T–CSF technical proposals and found that the joint proposal was consistent with the information reported in Paris.

As authorized by the Armed Services Procurement Regulations (32 CFR § 2–503–1(a) (8)) the government team requested clarification as to (1) whether French built parts would require metric tools for repair and maintenance purposes and (2) whether replacement parts were to be French or American built. TI responded to those inquiries that TI/T–CSF had decided that only American built parts would be used and that no metric tools would be necessary. Thereafter, the government evaluation team decided that the TI/T–CSF arrangement complied with the bidders' technical qualification clause of the letter request for technical proposals. That same team also decided plaintiff complied with that clause.

On April 29, 1970, the Air Force mailed invitations for bids to plaintiff and TI/T–CSF under the second step of the two-step procurement procedure.[6] On June 26, 1970, the bids were publicly opened with the low bid being that submitted by TI as principal contractor.

It is obvious from the foregoing discussion and the above stated undisputed facts that at all times the Air Force was fully informed of the TI/T–CSF relationship. No charge of fraud or deceit has been or could be made here.

The defendants justify the award of the contract to TI as principal contractor through its contract arrangement with T–CSF. That relationship defendants assert as a contract team arrangement as authorized by § 4.117, Armed Services Procurement Regulations. (32 CFR § 4.117.)[7]

---

6. The other three proposed bidders were determined to be not qualified and were not invited to submit bids.

7. § 4.117 Armed Services Procurement Regulations (32 CFR § 4.117) in its entirety reads:
Contractor team arrangements.
(a) Definition. A contractor team arrangement is one whereby two or more companies form a partnership or joint venture to act as a potential prime contractor or whereby a potential prime contractor agrees with one or more other companies to act as his subcontractor(s) under a specified Government procurement program.
(b) Policy. There are times when it may be desirable, both from the Govern-

ment and Industry standpoints, for companies to enter into a team arrangement prior to a Government contract award or thereafter. Team arrangements may be particularly appropriate for engineering and operational system developments, but may be used in other appropriate situations, including production procurement. Team arrangements allow a prime contractor and subcontractor to complement the unique capabilities of each and to offer the Government the best combination of capabilities to achieve the system performance, cost and delivery desired for the system being procured. The Government will recognize the integrity and validity of contractor team arrangements, provided they are identified and company relationships are stated in a pro-

That section of the Regulations defines a contractor team arrangement as including one where "a potential prime contractor agrees with one or more other companies to act as his subcontractor(s) under a specified Government procurement or program." 32 CFR § 4.-117(a). The Regulations recognize that from the standpoints of both the Government and industry there are times when such contractor team arrangements may be desirable. Particularly appropriate are such team arrangements "for engineering and operational system developments, including production procurement." Through team arrangements a prime contractor and subcontractor are allowed "to complement the unique capabilities of each and to offer the Government the best combination of capabilities to achieve the system performance, cost and delivery desired for the system being procured." Under a team arrangement the prime contractor is fully responsible for the performance of the contract. When "identified and company relationships are stated in a proposal" the Government has declared that it will recognize the integrity and validity of contractor team arrangements. 32 CFR § 4.117(b).

As has been noted the TI/T–CSF contractor team arrangement, including the relationship between the two companies, were fully disclosed to the Air Force prior to invitation to bid. The team arrangement and company relationship, identified and made known to the Air Force, were pursuant to an agreement between the companies. T–CSF would provide the technical personnel with the production experience necessary to direct the manufacture of the instrument landing system along with its technological knowledge, design data, trade secrets, patent rights, manufacturing techniques and other proprietary interests. In addition the companies' agreement provided that T–CSF would furnish site surveys, training instructions, maintenance instructions, relevant manufacturing data, and such other design data as might be required by Air Force specifications. T–CSF agreed to assume responsibility for equipment manufactured according to its instructions and to be responsible for the installation of the systems. TI in turn agreed to act as prime contractor with total managerial responsibility. In the beginning it was contemplated that certain equipment would be manufactured in France but subsequently it was agreed, as disclosed to the Air Force, that such equipment would be manufactured in the United States. A pre-award Air Force survey team, being fully informed of the company relationship, was of the view that TI, due to the automated techniques employed by it, could produce the instrument landing system more efficiently. Thus the Air Force was justified in concluding that, through their contract arrangements, TI and T–CSF would be able "to complement the unique capabilities of each and to offer the Government the best combination of capabilities to achieve the system performance, cost and delivery desired for the system being produced." TI, as principal contractor, having submitted the low bid was entitled to the contract awarded to it.

Plaintiff argues that when the Air Force survey team decided that TI could produce the instrument landing system

---

posal. Under a contractor team arrangement, the prime contractor is fully responsible for the performance of the contract. The Government normally will not require or encourage dissolution of contractor team arrangements. These policies do not authorize arrangements in violation of antitrust statutes and do not limit the Government's rights to:

(1) Approved subcontracts in accordance with ASPR requirements;

(2) Determine the responsibility of a prime contractor on the basis of the stated contractor team arrangement;

(3) Provide the selected prime contractor with data rights owned or controlled by the Government; and

(4) Pursue its policies on competitive procurement, subcontracting and component breakout, after initial production procurement or at any other time.

more efficiently in the United States than T–CSF could in France, it ignored an alleged change, from T–CSF to TI, as to which was to manufacture the system. Plaintiff contends that this is important because only the proven competence of T–CSF satisfied the special bidder qualification clause. In examining this contention it should be noted that, at the oral hearing on this motion, plaintiff stated that it was no longer relying on its earlier contention that TI was merely using T–CSF to "buy-into" the market. While it is true that T–CSF is manufacturing less of the subassemblies of the system than the TI/T–CSF agreement originally contemplated, its participation in the process through the use of its designs and through instruction and supervision by its own engineers who have been brought to the United States demonstrates that the team arrangement is still valid under the applicable Armed Services Procurement Regulations. This is especially true in light of the fact that the critical stage of installing the systems will be handled completely by T–CSF. Moreover, the changes in manufacturing locale and workmanship have resulted from a time lag in executing this contract due to appeals to the Comptroller General by the plaintiff, as well as by other companies not parties, during which period TI has become increasingly more sophisticated about instrument landing systems under the tutelage of T–CSF and as the result of requests by the Air Force. For example, the Air Force asked that none of the replacement parts or repair equipment be gauged in the metric system. Such changes do not reflect any attempt on the part of TI to misrepresent which company was to manufacture the system, but rather reinforce the continuing legitimate nature of the team arrangement.

Plaintiff argues that Superior Oil Company v. Udall, 133 U.S.App.D.C. 198, 409 F.2d 1115 (1969), requires this Court to hold that the award of the contract to TI as principal contractor violates the Armed Services Procurement Regulations and must be declared null and void. In that case the Secretary of Interior had awarded an oil and gas lease to a bidder who had failed to sign its bid, which was a direct violation of an applicable regulation. But here TI was awarded the contract as principal contractor because of its contract team arrangement with T–CSF, which relationship was provided for in the applicable regulation. The fact that TI had never manufactured a landing system does not make the contractor team arrangement regulation any less applicable. T–CSF, the associate contractor, was recognized by all, including plaintiff, as a highly qualified manufacturer of a successfully operating system of a higher category than even the system plaintiff had manufactured.

Nor does the concern of plaintiff's director of engineering, Earl D. Long, make the Armed Services Procurement Regulations inapplicable here. Long in his affidavit, which is attached to plaintiff's motion for summary judgment, expresses the view that TI in association with T–CSF cannot produce and install within the time provided effective Category II instrument landing systems. Notwithstanding Long's qualifications, as recited in his affidavit, his sworn statement with respect to TI/T–CSF must be recognized for what it is: opinion based in great part on conjecture or belief. That affidavit not showing that it was made on Long's personal knowledge of the TI/T–CSF joint operations is without probative value on a motion for summary judgment. Rule 56(e), Fed.R.Civ.P. Bowen Electric Co., v. J. D. Hedin Construction Co., 114 U.S.App.D.C. 361, 363, 316 F.2d 362 (1963).

Moreover, it is not the function of an employee of an unsuccessful bidder to determine whether the successful bidder can perform the contract. That is the responsibility of the contracting officers —here the Air Force employees. Unless it is shown that their decision to award the contract to TI as principal contractor was either an abuse of discretion or in violation of applicable law and regula-

**504**

tions, that decision must stand. No such showing has been made here. Indeed the undisputed facts and applicable Armed Services Procurement Regulations make clear that the Air Force did not act arbitrarily, capriciously, or in violation of law. Thus this is a proper case for summary judgment. Blackhawk Heating and Plumbing Co. v. Driver, D.C. Cir., 433 F.2d 1137 (1970). See also Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 873 (1970).

Defendants' motions for summary judgment are granted. Plaintiff's motion for summary judgment is denied. Plaintiff's motion for a preliminary injunction is denied.