**CHEVRON OIL COMPANY et al.,
Plaintiffs-Appellees,**

v.

**Cecil D. ANDRUS, Secretary, Department
of the Interior et al.,
Defendants-Appellants.**

No. 77–2186.

United States Court of Appeals,
Fifth Circuit.

Feb. 9, 1979.

Rehearing and Rehearing En Banc
Denied March 8, 1979.

**1384**

Gerald J. Gallinghouse, U. S. Atty., Ford J. Dieth, Asst. U. S. Atty., New Orleans, La., Andrew F. Walch, Dept. of Justice, James W. Moorman, Acting Asst. Atty. Gen., Edmund B. Clark, Charles E. Biblowit, Raymond N. Zagone, Attys., Dept. of Justice, Land & Natural Resources Div., Washington, D. C., for defendants-appellants.

Wilson S. Shirley, Jr., John C. Christian, M. Hampton Carver, New Orleans, La., for plaintiffs-appellees.

Before BROWN, Chief Judge, GEWIN and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This case requires us to construe the Department of Interior's regulations for the leasing of oil and gas development rights on the nation's outer continental shelf. The question presented is whether the Department has bound itself by regulation to abide by the unreviewed action of a regional manager in the evaluation of bids for leases. The district court held in the affirmative and on this basis issued an injunction forbidding the rejection of Chevron Oil Company's bids. We reverse.

## I.  *Facts*

Outer Continental Shelf (OCS) Oil and Gas Lease Sale No. 37 was held in New Orleans, Louisiana on February 4, 1975. Appellees (hereinafter Chevron) were the highest bidders on two of the tracts offered for lease. After the public opening of bids, the Gulf of Mexico OCS Office, Bureau of Land Management (BLM), Department of Interior, in accordance with its usual practice, prepared statistical analyses of the bids received. On the basis of this analysis, Mr. John Rankin, Manager of the Office, recommended that Chevron's bids be accepted.[1] The Director of BLM also recommended acceptance. The Assistant Secretary for Land and Water Resources, Department of Interior, recommended that the bids be rejected as inadequate. Deputy Under Secretary of the Interior William W. Lyons, whose action was final for the Department in this matter, decided that Chevron's bids should be rejected. Pursuant to this determination, Chevron was notified in writing by Mr. Rankin on February 25, 1975, that its high bids on the two tracts had been rejected.[2]

Requests for reconsideration were made to the Secretary of Interior but denied. Appellees then filed these suits seeking a declaration that they are entitled to the leases and an order directing that the leases be issued. On cross motions for summary judgment, the district court held that under

1. Mr. Rankin also had before him the recommendation of the Acting Conservation Manager, Gulf of Mexico OCS Operations, Geological Survey that the bids be rejected.

2. There is no question that Chevron was a qualified bidder. The United States, however, in both the public notice of sale, 40 Fed.Reg. 804 (1975), and the Department of Interior Regulations, 43 C.F.R. 3302.5 (1977), reserved the right to reject any and all bids.

the Department's regulations Mr. Rankin is the official whose decision to accept or reject high bids is controlling; Mr. Rankin, in the exercise of his independent judgment, concluded that Chevron's bids should be accepted, and that judgment could not be overruled by the Secretary or any subordinate acting for him. These appeals followed, and the order to issue the leases has been stayed pending our decision.

## II. *The Regulatory Scheme*

Statutory authority for the letting of oil and gas leases is found in the OCS Lands Act, 43 U.S.C. §§ 1331–43 (1970), section 8(a) of which provides:

> In order to meet the urgent need for further exploration and development of the oil and gas deposits of the submerged lands of the outer Continental Shelf, the Secretary [of the Interior] is authorized to grant to the highest responsible qualified bidder by competitive bidding under regulations promulgated in advance, oil and gas leases on submerged lands of the outer Continental Shelf . . . .

43 U.S.C. § 1337(a) (1970). Interior's regulations for mineral leases on the OCS appear at 43 C.F.R. Part 3300 (1977). The award of leases is covered by section 3302.5:

> § 3302.5 Award of lease.
>
> Sealed bids received in response to the Notice of Lease Offer shall be opened at the place, date and hour specified in the notice. The opening of bids is for the sole purpose of publicly announcing and recording the bids received and no bids will be accepted or rejected at that time. In accordance with section 8 of the [OCS Lands] Act, leases will be awarded only to the highest qualified responsible bidder. The United States reserves the right and discretion to reject any and all bids received for any tract, regardless of the amount offered. Awards of leases will be made only by written notice from

the authorized officer. . . . If the authorized officer fails to accept the highest bid for a lease within 30 days after the date on which the bids are opened, all bids for that lease will be considered rejected. Notice of his action will be transmitted promptly to the several bidders.

The Secretary has delegated administration of these regulations as follows:

> Subject to the supervisory authority of the Secretary, the regulations in this part shall be administered by the Director, Bureau of Land Management, hereinafter referred to in this part as the Director.

43 C.F.R. § 3300.0–3 (1977).

The "authorized officer" in section 3302.5 is defined in 43 C.F.R. 3000.0–5(f) as "any person authorized by law or by lawful delegation of authority in the Bureau of Land Management to perform the duties described." The Director, BLM has been authorized "to take all actions . . . with respect to [OCS mineral leases]," Secretary of Interior Order No. 2583, Part 2, § 2.36, 15 Fed.Reg. 5643 (1950), *as amended,* 27 Fed. Reg. 2862 (1962), and the Director has in turn authorized the Manager, Gulf of Mexico OCS Office to act with respect to leases in the Gulf of Mexico, Bureau of Land Management Order No. 701 § 4.6(b), *as amended,* 39 Fed.Reg. 9213 (1974). Mr. Rankin has been the Manager of the Gulf of Mexico OCS Office since 1959.

Chevron's argument, accepted by the court below, is straightforward. Read as a whole, regulations vest the authority to award or withhold leases in the "authorized officer." Mr. Rankin, by delegation, is the authorized officer for Gulf of Mexico leases; therefore, the argument goes, his decision to accept Chevron's bids was binding on the Department, in the absence of a specific regulation permitting the Secretary or any-

one acting for him [3] to overrule Mr. Rankin. Primary reliance is placed on the case of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), for the proposition that an executive officer who by regulation vests his discretionary authority in a subordinate thereby deprives himself of the power to make the decision himself. Chevron argues that here the Secretary may amend the regulations and revest in himself the authority to issue or deny leases, but so long as the present regulations stand, Mr. Rankin's decisions are controlling.

This argument, in our view, misconstrues Interior's regulations and misreads *Accardi*. In that case, regulations of the Attorney General delegated to the Board of Immigration Appeals certain of his discretionary powers in deportation cases and required that

> "[i]n considering and determining . . . appeals, the Board of Immigration Appeals shall exercise such discretion and power conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case. The decision of the Board . . . shall be final except in those cases reviewed by the Attorney General [as further provided for herein]."

347 U.S. at 266, 74 S.Ct. at 503 (quoting 8 C.F.R. § 90.3(c) (1949)). The Court held that the regulations required the Board to exercise its own judgment in considering appeals, and "as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner." *Id.* at 267, 74 S.Ct. at 503. The Attorney General had dictated the Board's decision in Accardi's case by including his name in a list of "unsavory characters" whom the Attorney General wanted deported and circulating the list to the Board members prior to their decision on Accardi's appeal. Ac-

cordingly, the Court ordered a new hearing at which the Board was to exercise its own independent judgment, as the regulations required.

We think *Accardi* stands for the unremarkable proposition that an agency must abide by its own regulations. *See Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957). Where, as in *Accardi*, the regulations vesting discretion in a subordinate require that subordinate to exercise his independent judgment, the administrator must permit him to do so, but the question in each case is what do the regulations require and has the agency complied with them. In *Accardi*, the Court found that the language of the regulations ("the Board . . . *shall* exercise such discretion" (emphasis added)) required the Board to arrive at an independent decision, subject to review by the Attorney General in specified instances. The regulations conferred important due process rights upon petitioners before the Board which the Attorney General could not violate by interfering *prior* to the Board's decision and dictating the result. The Court said nothing about the circumstances under which the Attorney General could review and reverse a decision once it had been made by the Board. *Accardi* says only that, where applicable regulations so provide, an agency head must permit his subordinate, as an initial matter, to make an independent judgment without interference. *Service v. Dulles*, 354 U.S. at 386, 77 S.Ct. at 1164 (in *Accardi*, "the Attorney General bound himself not to exercise his discretion until he had received an impartial recommendation from a subordinate board"); *Marcello v. Bonds*, 349 U.S. 302, 311, 75 S.Ct. 757, 762, 99 L.Ed. 1107 (1955) (issue in *Accardi* was "prejudgment").

■ *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) did not

---

**3.** Throughout this opinion "Secretary" refers to the Secretary of the Interior and those secretarial officers authorized to exercise his power,

which, in this case, includes the Assistant Secretary and the Deputy Under Secretary who acted on these leases.

modify *Accardi*'s holding. One issue in that case was whether a justiciable controversy existed. In the course of its analysis, the Court said:

> In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), regulations of the Attorney General delegated certain of his discretionary powers to the Board of Immigration Appeals and required that Board to exercise its own discretion on appeals in deportation cases. *The Court held that so long as the Attorney General's regulations remained operative, he denied himself the authority to exercise the discretion delegated to the Board even though the original authority was his and he could reassert it by amending the regulations.*

*Id.* at 695–96, 94 S.Ct. at 3101 (emphasis added). The emphasized language does not mean, as Chevron contends, that every delegation deprives the delegator of the power assigned. The discussion of *Accardi* quoted *supra* was immediately preceded by the statement: "So long as [a] regulation is extant it has the force of law." *Id.* at 695, 94 S.Ct. at 3101. *Nixon* simply reaffirms *Accardi*'s holding that an agency is bound by its regulations. Whether an administrator has deprived himself of the power to act is dependent on the particular terms of the regulation.[4] The Secretary of Interior is bound by Mr. Rankin's determination only if the Department's regulations so provide. We think they do not.

The regulations here are quite different from those in *Accardi* or *Nixon*. *First*, nowhere do they require the authorized officer to make an initial independent decision. We agree with Chevron that Mr. Rankin has the authority to act for the Department regarding these leases, but nowhere is he compelled to do so.[5] He may accept or reject leases without seeking the approval of his superiors, but he is not precluded from seeking such approval. *Second*, even if he were so compelled, no one interfered with his exercise of independent judgment in this case. There was no attempt to influence his determination in advance. As we have explained, this is all that *Accardi* requires. *Third*, we think there is merit to Interior's contention that designation of Mr. Rankin as an authorized officer under section 3302.5 does not deprive the Secretary of the power to review and revise his determinations before they are communicated to the bidders. *Cf. The Skokomish Indian Tribe v. General Services Administration*, 587 F.2d 428, 431–432 (9th Cir. 1978) (Secretary of the Interior may withdraw request by subordinate agency to GSA for transfer of "excess" property any time prior to actual transfer). No decision binding on the Department is made until written notice is sent to the bidders or 30 days pass without a decision.[6] To review and overrule the recommendation of a subordinate is not to dictate or "sidestep" his decision within the meaning of *Accardi*. Here, Interior's regulations explicitly provide that the BLM administers the leasing regulations "subject to

---

**4.** In *Nixon*, the regulation provided in no uncertain terms that the Special Prosecutor had full authority to contest the assertion of Executive Privilege and prosecute his cases without interference. *Id.* at 694–95 n.8, 94 S.Ct. at 3100–01. The Court held that the President's refusal to comply with the Special Prosecutor's subpoena presented a justiciable issue since the Special Prosecutor was acting within his authority under the regulation.

**5.** Nor do we think he purported to do so in this case. Mr. Rankin memorialized the results of his post-sale analysis by placing an "A" (meaning accept) in the column marked "BLM/N.O." opposite the entries for Chevron's two bids on

the Consistency Matrix and by placing check marks in the "accept" column on the Sale Matrix, two documents prepared as part of the post-sale analysis. The parties disagree as to whether this was a "decision" or merely a "recommendation" to accept the bids. Had Mr. Rankin sought to act authoritatively for the Department, he would have had to send Chevron a written notice, the only means by which leases can be awarded under the regulations. He did not do so.

**6.** Where the BLM acts without the participation of a Secretarial officer, an appeal lies to the Board of Land Appeals. 43 C.F.R. § 4.410 (1977).

the supervisory power of the Secretary." [7] Moreover, Interior's Departmental Manual provides that "[a]n officer who delegates or redelegates authority does not divest himself of the power to exercise that authority." 200 D.M. § 1.3 (1970).[8]

We think it clear that sole decisional authority was not conferred upon Mr. Rankin by Interior's regulations. Even if we ignored the Departmental Manual we would be most reluctant to accept Chevron's argument, for,

[a]s a general proposition of administrative law, the head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direction of the superior or the power to administer is vested in the superior.

*Morrow v. Clayton*, 326 F.2d 36, 45–46 (10th Cir. 1963) (citing *Knight v. United Land Association*, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 (1891)). To hold otherwise would create havoc in the administration of our laws.

*Superior Oil Co. v. Udall*, 133 U.S.App. D.C. 198, 409 F.2d 1115 (1969) is not to the contrary. There, the D.C. Circuit held that Interior was bound by Mr. Rankin's *rejection* of a bid. Then, as now, Mr. Rankin was Manager of the Gulf of Mexico OCS Office. At the opening of bids, Mr. Rankin announced that one high bid was not acceptable because not signed by the bidder. The court held that the Secretary could not subsequently excuse the omission and accept the bid. Crucial to the decision in the case was the language of the regulations then in force:

"Following the public opening of the sealed bids as provided in the notice of lease offer, the *authorized officer*, subject to *his right to reject any and all bids* will award the lease to the successful bidder."

133 U.S.App.D.C. at 202, 409 F.2d at 1119 (quoting 43 C.F.R. § 3382.5) (emphasis in original). The regulations clearly established the right of the authorized officer to accept or reject bids at the time of their opening. The court simply held that, in view of the substantial interest of the public and the bidders in certainty in the bidding procedures, the Secretary could not override the Manager's publicly announced rejection of a bid. Largely in response to the *Superior Oil Co.* decision, the regulations were amended to their present form. They now preclude the oral acceptance or rejection of bids at the opening; leases may only be awarded by written notice. No written notice was ever sent to Chevron accepting its bids; therefore the Department never committed itself to accept them. *Superior Oil Co.* is simply irrelevant to the present case.

7. Chevron contends that the reservation of supervisory power is unavailing. It cites *Accardi*, where the majority was not persuaded that a similar reservation supported the Attorney General's action. As we have gone at length to point out, the cases are quite different. Supervisory power cannot justify prior interference with a subordinate required to act independently. It is the essence of supervisory power, however, to review and revise the judgments of subordinates after they are made.

8. Chevron argues that Interior is precluded from relying on this provision because it was not published in the Federal Register as required by 5 U.S.C. § 552(a)(1) (1976). We do not agree. By its own terms, section 552(a)(1) requires only that a person may not "be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." Thus, it has been held that this section's "requirement for publication attaches only to matters which if not published would adversely affect a member of the public," *Hogg v. United States*, 428 F.2d 274, 280 (6th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971), or which affect the steps a party must take to present a matter to the agency, *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1405 (Temp.Emer.Ct.App.1975). The provision in Interior's manual does not relate to the manner in which bids must be submitted. Nor was Chevron adversely affected by its nonpublication. We do not believe that knowing that the Secretary could participate in a decision to reject a bid would have induced Chevron to bid more than it did, and only a higher bid would have influenced the Deputy Under Secretary's decision.

We hold that the Department of Interior acted in conformity with its regulations in rejecting Chevron's bids.

### III. *Judicial Review of the Secretary's Decision*

Technically, our task is at an end. Having resolved the dispositive issue in the appellant's favor, we could simply remit the parties to the district court for further proceedings. Our decision, however, brings to the fore the issue of whether the Secretary's determination to reject the high bid of a qualified bidder is subject to judicial review. We would ill serve the goals of judicial economy and fairness if we required these parties to spend years in additional litigation only to appear before this court again with a question of law. *See Save the Bay, Inc. v. Administrator of E.P.A.*, 556 F.2d 1282, 1292 (5th Cir. 1977). Accordingly, we turn to the reviewability issue.

The OCS Lands Act neither expressly provides for nor expressly precludes judicial review in this type of case. Review of final agency action is available, however, under section 10 of the Administrative Procedure Act (APA),[9] 5 U.S.C. §§ 701–706 (1976), "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Id.* § 701(a) (1976). The issue then is whether the Secretary's action in this case comes within the exceptions of section 701(a).

In deciding this question, we have drawn substantial guidance from the Supreme Court's decision in *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). The question presented there was the reviewability of the Attorney General's failure to interpose a timely objection under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1976).[10] Mr. Justice Powell, writing for the Court, first reaffirmed the presumption in favor of judicial review: "It is now well settled that 'judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" 432 U.S. at 501, 97 S.Ct. at 2418 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)); *accord, Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Graham v. Caston*, 568 F.2d 1092, 1096–97 (5th Cir. 1978); *Save the Bay, Inc. v. Administrator of E.P.A.*, 556 F.2d at 1293. He then analyzed "the role played by the Attorney General within 'the context of the entire legislative scheme,'" 432 U.S. at 501, 97 S.Ct. at 2419, (quoting *Abbott Laboratories v. Gardner*, 387 U.S. at 141, 87 S.Ct. at 1511), and concluded, on the basis of the statutory language, the legislative history, and the potential severity of the section 5 remedy, that Congress intended to preclude judicial review of the Attorney General's action, 432 U.S. at 504–05, 97 S.Ct. at 2421. The Court focused particularly on the "unusual" and "severe" nature of the section 5

**9.** The pertinent sections of the APA provide:

§ 702. Right of review.

A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof.

§ 704 Actions reviewable.

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

§ 706 Scope of review.

The reviewing court shall—

(2) hold unlawful and set aside agency action . . . found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**10.** Section 5 requires federal preclearance review of voting legislation of covered jurisdictions for conformity with the Constitution and the Voting Rights Act. Review may be obtained through a declaratory judgment action in the District Court for the District of Columbia or by submission of the change to the Attorney General after which the change may be enforced if "the Attorney General has not interposed an objection within sixty days."

remedy, whose effect is to delay implementation of validly enacted state legislation pending federal review, and noted a clear congressional purpose to provide an expeditious alternative to declaratory judgment actions. Judicial review of the Attorney General's failure to object would impermissibly prolong the preclearance procedure and "add acrimony" to the administration of section 5. *Id.* at 504 & n.19, 97 S.Ct. at 2420–21. Reinforcement for the Court's conclusion was found in the fact that failure of the Attorney General to object did not deprive aggrieved persons of their only remedy; the statute explicitly provides that private suits to bar enforcement of voting legislation are not precluded by such failure. *Id.* at 505, 97 S.Ct. at 2421.

Turning to the role of the Secretary in the entire legislative scheme now before us, we find no persuasive indication that Congress intended to preclude review. We do not think the procedure here can properly be characterized as unusual or severe. Moreover, the APA appears to provide the exclusive means to obtain review of the rejection of a bid by the Secretary.[11] The severity and non-exclusivity of the section 5 remedy were important factors in *Morris* tending to rebut the presumption of reviewability. Nothing comparable is presented here.

Interior has referred us to passages in the testimony of Attorney General Brownell before committees of the House and Senate that were considering the OCS legislation. In his prepared statement, the Attorney General recommended that the Secretary of Interior be given latitude in the development of management policies for OCS resources. Such a grant of power would, in his view, reduce the controversy and litigation over day-to-day problems. *Submerged Lands: Hearings on S.J. Res. 13 and Other Bills Before the Senate Comm. on Interior and Insular Affairs*, 83d Cong., 1st Sess. 926–27 (1953); *Submerged Lands: Hearings on H.R. 2948 and Similar Bills Before Subcomm. No. 1 of the House Comm. on the Judiciary*, 83d Cong., 1st Sess. 218–19 (1953). We do not think that in so recommending, the Attorney General intended that the Secretary's actions be unreviewable. In context, it is clear that he meant only that Congress should not attempt to draft detailed rules concerning the management of OCS resources; in view of the unforeseeable problems that would arise, this task was better left to an administrator.[12] This, as the Attorney General observed, is merely a principle of good statutory draftsmanship. Delegation of the discretion to work out details reduces litigation because the administrator can more easily adapt his rules to changed conditions than can the Congress. The mere grant of such discretion does not compel the conclusion that it was intended to be unreviewable.

We are similarly unpersuaded by Interior's other arguments. It is quite true, as Interior points out, that the Secretary is permitted, rather than compelled, to issue leases. This fact alone does not commit that action to his unreviewable discretion.

11. When the Secretary does not intercede, decisions of BLM officers may be appealed to the Board of Land Appeals. 43 C.F.R. § 4.410 (1977). In such cases, the Board decides finally for the Department. *Id.* § 4.1(3).

12. He testified:

We think . . . that the principles of good statutory draftsmanship would require the Congress to lay down the basic rules, and, wherever you think there is a matter of great importance, that should be in the statute. So far as the day-to-day management policies are concerned, we believe that it is sensible statutory draftsmanship to leave a considerable amount of discretion and lee-

way in the administrative office. It is pretty hard to foresee all the questions that are going to come up, especially in a newly developed area of this kind.
*Submerged Lands: Hearings on S.J. Res. 13 and Other Bills* at 942.

To the same effect is the statement of Secretary of the Interior McKay: "Because of always changing conditions, some of which are unforeseeable, I would hope that the legislation would grant such discretion to the Department of the Interior in management policies as is consistent with the thinking of the Congress."
*Submerged Lands: Hearings on H.R. 2948 and Similar Bills* at 181.

*Save the Bay, Inc. v. Administrator of E.P.A.*, 556 F.2d at 1293. Interior contends that because Congress explicitly provided for judicial review elsewhere in the OCS Lands Act,[13] its failure so to provide in this case is telling. But the maxim *expressio unius est exclusio alterius* has been denied conclusive effect in this area. *See Morris v. Gressette*, 432 U.S. at 506 n.22, 97 S.Ct. at 2421. In any event, a rule of statutory construction could not provide the "clear and convincing evidence" necessary to support an inference of nonreviewability. *See Rusk v. Cort*, 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962); *accord, Dunlop v. Bachowski*, 421 U.S. 560, 568, 95 S.Ct. 1851, 1858, 44 L.Ed.2d 377 (1975); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

Finally, Interior argues that "[t]he determination to accept or reject a high bid involves complex, technical considerations of economics, geology, geophysics, stratigraphy and paleontology, matters which courts are ill-equipped to handle." Brief for Appellants at 23. This argument erroneously assumes that a reviewing court would attempt to substitute its judgment for that of the expert agency. Our task under the "arbitrary and capricious" standard of review is to determine whether the agency has a reasoned basis for its action. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); *State of Florida v. Mathews*, 526 F.2d 319, 324–25 (5th Cir. 1976). That this endeavor may require the consideration of technical and specialized matters does not disable a court from proceeding. *See Greater Boston Television Corp. v. F.C.C.*, 143 U.S.App.D.C. 383, 444 F.2d 841, 850 (1970), *cert. denied sub nom. WHDH, Inc. v. F.C.C.*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).[14]

■ In sum, we hold that the appellants have not carried their burden to overcome the presumption of reviewability. *Accord, Kerr-McGee Corp. v. Morton*, 174 U.S.App. D.C. 55, 527 F.2d 838 (1975). The appellees may seek on remand to have the rejection of their bids overturned as arbitrary and capricious.[15]

### IV. *Conclusion*

The district court's grant of summary judgment is REVERSED and the cause REMANDED for further proceedings.

---

**13.** *See, e.g.*, 43 U.S.C. §§ 1335(d) (validation of prior leases), 1337(j) (cancellation of leases), 1333(b) (operational disputes and rights to resources).

**14.** Interior points to *Panama Canal Co. v. Grace Line, Inc.*, 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958) as holding that where the informed judgment of an agency involves technical matters it is unreviewable. The case is not controlling here. In a rather opaque opinion, the Court held that "the *initiation* of a proceeding for readjustment of the tolls of the Panama Canal is a matter that Congress has left to the discretion of the Panama Canal Co." *Id.* at 317, 78 S.Ct. at 757 (emphasis added). We think there is a difference between compelling an agency to undertake a task within its authority and reviewing the action of an agen-cy once taken. Moreover, the continued vitality of the *Panama Canal Co.* case as precedent is questionable. It has never been overruled, but neither has the Court ever referred to it in the numerous subsequent cases on reviewability of agency action. We think *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), far better reflects the Court's current thinking.

**15.** Interior urges us to resolve this issue now and spare the parties further litigation. This we cannot do. The district court did not reach the issue and hence there are no findings to review. On the record before us, we cannot hold as a matter of law that Chevron cannot make out a case of arbitrary and capricious agency action.