United States Court of Appeals,

Fifth Circuit.

No. 92-4149.

DEPARTMENT OF JUSTICE, United States Immigration and Naturalization Service, United States Border Patrol, El Paso, TX, Petitioner-Cross-Respondent,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent-Cross-Petitioner.

May 26, 1993.

Petitions for Review of Order of the Federal Labor Relations Authority.

Before JOLLY, DAVIS, and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

We review a Federal Labor Relations Authority ("FLRA") decision concerning a union's demand for documents from a government agency. The FLRA argues that the United States Border Patrol committed an unfair labor practice ("ULP") when it refused to produce a mountain of material relating to a member-officer's claim that he was unfairly given a low performance rating.

The Federal Service Labor Management Relations Statute ("FSLMRS") requires a government agency to furnish the union with information if the data is 1) reasonably available, and 2) necessary for the union to represent its members. The administrative law judge held that the documents were both necessary and reasonably available, and that the Border Patrol had, therefore, committed a ULP when it refused to produce the requested data. The FLRA affirmed. We now reverse. First, we hold that the FLRA's interpretation of "necessary" is not supportable because it confuses the term with "useful." Second, given the extraordinary number of documents and the burdens of compiling, collating, and redacting the documents, we hold that the documents were not *reasonably* available. We, therefore, reverse the FLRA's decision, and deny the FLRA enforcement of its order.

I

During the late 1980's, the United States Border Patrol employed Robert J. Marren as a border patrol agent at the Fabens Station in El Paso. Marren was also the executive vice president

of his local union.  The Border Patrol used the following rating system in evaluating its agents: outstanding, excellent, fully successful, minimally satisfactory, and unacceptable.  At the end of the Border Patrol's fiscal year ending in April 1988, the Border Patrol gave Marren an overall rating of fully successful.  The Border Patrol also rated seven of Marren's fellow agents fully successful.  The Border Patrol rated the other two agents as excellent.

In May of 1988, Marren, acting in his capacity as executive vice president of the union, notified the Border Patrol that he was considering filing a grievance over his own performance appraisal on the basis of disparate treatment.  Marren said that he suspected that the Border Patrol gave him a lower rating than he deserved in retaliation for his activities as a union officer.  To evaluate at the outset the propriety of filing a grievance, Marren requested the four following categories of information on himself and his fellow employees:

> 1. All of the performance appraisals for all of the employees during the period April 1, 1987 through April 8, 1988.
>
> 2. All documents contained in the Employee Performance Files that the Border Patrol maintains on Marren and his fellow employees.
>
> 3. All documents contained in the Supervisory Work Folders the Border Patrol maintains on Marren and his fellow employees.
>
> 4. Copies of any and all documents and reports Marren and his fellow employees completed during the 1987/1988 rating period.

The fourth category of information that Marren requested included all of the written work produced by ten Border Patrol agents over a one-year period.[1]  Border Patrol agents like Marren regularly complete various forms, and prepare memoranda, reports, and other documents.  Marren's request encompassed between 5,000 and 6,000 documents.  The Border Patrol keeps these documents in

---

[1]This is the third time that Marren has requested this kind of information from the Border Patrol.  In prior information requests, Marren asked for the same information for different ratings periods.  The FLRA ordered the Border Patrol to release the information Marren requested in all three information requests.  In the prior information requests, however, the Border Patrol did not challenge the FLRA's orders.  *See Department of Justice, United States Immigration and Naturalization Service, United States Border Patrol, El Paso, Texas and American Federation of Government Employees, AFL-CIO, National Border Patrol Council,* 37 FLRA (No. 110) 1310 (1990) (hereinafter "*Border Patrol I* ");  *Department of Justice, United States Immigration and Naturalization Service, United States Border Patrol, El Paso, Texas and American Federation of Government Employees, AFL-CIO, National Border Patrol Council,* 40 FLRA (No. 64) 792 (1991) (hereinafter "*Border Patrol II* ").

several locations in the United States and in other countries. Moreover, the Border Patrol organizes many of these documents according to the alien involved and not the agent.

In response to this request, the Border Patrol asked the union for specifics about the alleged disparate treatment so that it could determine whether the information was relevant and necessary. The Border Patrol also voluntarily complied with part of Marren's request by providing the union with the ratings it gave Marren's fellow employees. Marren found the information inadequate, and informed the Border Patrol that the union needed all of the information that it had requested to perform its "representational obligation to conduct a full and impartial investigation." Marren indicated that the Border Patrol could supply the information in a sanitized form that would not reveal confidential information. Marren, however, rejected the Border Patrol's request for specifics to support his request.

In September of 1988, the Border Patrol denied Marren's request for information on the grounds that 1) the information it had already provided was sufficient to demonstrate that no disparate treatment existed and 2) the union had not specifically explained why it needed more information. Nevertheless, the Border Patrol informed Marren that he could personally review the agency's files and that the agency would provide copies of any specific documents that Marren found the union needed. Concluding that the Border Patrol's actions were unsatisfactory, the union filed an unfair labor practice ("ULP") charge. Based on that ULP charge, the FLRA General Counsel prosecuted the ULP complaint now before us.

II

The Border Patrol presented evidence before the administrative law judge ("ALJ") that Marren did not request the information for legitimate purposes. The Border Patrol contended that Marren requested the information to harass management because of his animosity toward the Border Patrol. One witness testified that Marren had said that "he was out to screw the government and he had 13.5 years to do it." Another witness testified that Marren had admitted he was conducting a "war on management." To show a pattern of bad faith, the Border Patrol also offered evidence to show that Marren had filed numerous ULP charges, and that Marren had made other burdensome

requests for information.

The Border Patrol also presented evidence that it would be burdensome for it to find, collect, duplicate, and sanitize the information that the union wanted. The Border Patrol showed that it would take one employee two days just to find all the Form 312's prepared by one agent during one month. The two days did not include the time it would take the Border Patrol to redact confidential information and make final copies for the union. Marren's actual request for information included fifteen different forms prepared by ten agents over twelve months. As noted above, the information request included thousands of documents stored in several locations in the United States and in other countries, filed under various classifications and categories.

After hearing all of the evidence, the ALJ determined that the Border Patrol had violated section 7114(b)(4) of the Federal Service Labor Management Relations Statute ("FSLMRS"). 5 U.S.C. § 7101 *et seq.* Pursuant to section 7114(b)(4), the union has a right to information that is "reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining." The ALJ found that the information was necessary because the information was relevant to the dispute between the union and the Border Patrol. Similarly, the ALJ found that the information was reasonably available because producing the information would not be unduly burdensome. Finally, the ALJ found that, although the Border Patrol presented credible evidence, the Border Patrol had not presented sufficient evidence to convince him that the union was acting in bad faith.

The Federal Labor Relations Authority ("FLRA") affirmed the ALJ's decision. The FLRA found that the information the union requested was necessary because is was "useful to the union in the investigation and/or representation of a potential grievance." The FLRA concluded that the information was reasonably available because the Border Patrol had not shown that it would be extremely or excessively burdensome for the Border Patrol to produce the documents. The FLRA also agreed with the ALJ that the Border Patrol had not established that the union had requested the information in bad faith. After the time for filing a motion to reconsider had passed, the D.C. Circuit decided *NLRB v. FLRA,* 952 F.2d 523 (1992). Arguing that there were extraordinary circumstances,

the Border Patrol moved to file an untimely motion to reconsider, but the FLRA denied the motion. The Border Patrol appeals.

## III

We must first determine whether this dispute is moot because Marren no longer works for the Border Patrol. A case becomes moot when the parties no longer have a legally cognizable interest in the outcome. *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). ULP cases, however, generally do not become moot when the individual parties resolve the specific matter that gave rise to the dispute because the "Board is entitled to have the resumption of the unfair practice barred by an enforcement decree." *NLRB v. Raytheon Co.,* 398 U.S. 25, 27, 90 S.Ct. 1547, 1549, 26 L.Ed.2d 21 (1970) (quoting *NLRB v. Mexia Textile Mills,* 339 U.S. 563, 568, 70 S.Ct. 826, 828, 94 L.Ed. 1067 (1950)).[2] The FSLMRS is modeled after the National Labor Relations Act, and courts treat the issue of mootness the same under both statutes. *See United States Dept. of Justice v. FLRA,* 727 F.2d 481 (5th Cir.1984); *AFGE, Local 3090 v. FLRA,* 777 F.2d 751, 753 n. 13 (D.C.Cir.1985).

In a case very similar to the case before us, the D.C. Circuit held that the death of an employee allegedly harmed by an agency's ULP did not moot the controversy. *AFGE, Local 1941 v. FLRA,* 837 F.2d 495, 497 n. 2 (D.C.Cir.1988). The court held that the FLRA had an interest in vindicating the employee's rights and preventing future violations. The court also noted that, even after the employee's death, the FSLMRS provided the FLRA with remedies, including a cease and desist order and the posting of an unfair labor practice notice. *Id.* We agree with the D.C. Circuit's reasoning. Thus, the case before us is not moot because the FLRA still has an interest in the controversy and because the FSLMRS provides remedies that are still available to the FLRA.

## IV

We now turn to the merits of this case. The sole question before us is whether the FLRA properly determined that, pursuant to 5 U.S.C. § 7114(b)(4), the union was entitled to the

[2]*See also N.L.R.B. v. Great Atlantic & Pacific Tea Co.,* 407 F.2d 387, 388 (5th Cir.1969) (We found that the "Board is entitled to judicial enforcement of its orders even in cases where the offending parties have already complied with the orders.")

information it requested from the Border Patrol. We review the FLRA's order to ensure it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see also* 5 U.S.C. § 7123. We will affirm the FLRA's factual findings if they are supported by substantial evidence, and we will defer to the FLRA's legal conclusions as long as they are reasonable and supportable. *See* 5 U.S.C. § 7123(c); *United States Dept. of Justice v. FLRA,* 955 F.2d 998, 1001 (5th Cir.1992).

This dispute turns on the proper interpretation of 5 U.S.C. § 7114(b), which provides:

The duty of an agency and an exclusive representative to negotiate in good faith under subsection (a) of this section shall include the obligation * * *

(4) in the case of an agency, to furnish to the exclusive representative involved, or its authorized representative, upon request and, to the extent not prohibited by law, data * * *

(B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining.

Thus, under this section the Border Patrol must furnish information if the information is 1) reasonably available, and 2) necessary for the union to represent its members. Both parties agree that the union is entitled to the information it has requested if the information meets each prong of this two-part test. The parties differ only on their interpretation of this test.

Beginning with the first part of the test, the FLRA contends that information is necessary if it is useful to the union in processing a grievance. The FLRA correctly notes that federal agencies have a broad obligation to disclose information to the unions with which they negotiate. *Am. Fed. of Gov. Employees, AFL-CIO v. FLRA,* 793 F.2d 1360, 1363 (D.C.Cir.1986).

Although the FLRA's argument that the documents will be "useful" may be plausible, when we focus on the specific language in the controlling statute, we are convinced that the FLRA's order in this case should not be enforced. In the first place, we find that the FLRA's interpretation of the statute's necessity requirement simply is not reasonable or supportable. The FLRA seems to have taken the standard that the National Labor Relations Board uses in the private sector, i.e., useful and relevant, and appropriated it for the public sector. *See, e.g., Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1092 (1st Cir.1981). The relationship between a union and a federal agency, however, is not governed by the same statute that governs the private sector. In the FSLMRS,

Congress chose a much higher standard to regulate the production of information in order to promote efficient government action. *NLRB,* 952 F.2d at 531. Indeed, the FSLMRS instructs the FLRA—and us for that matter—to interpret the statute in a "manner consistent with the requirement of an effective and efficient government." 5 U.S.C. § 7101(b).

Under the FSLMRS, unlike the NLRA, unions are entitled only to *necessary* information. There is a significant qualitative and quantitative difference between information that is relevant and information that is necessary. Information that is only relevant may be useful, but it does not fall under the category of necessary. The information becomes necessary only if the information is required in order for the union adequately to represent its members.

Furthermore, necessity may often be a matter of degree. If, for example, the grievance is simple, or the stakes for the union members are minimal, or the number of affected employees is very limited, the union should be able to meet its representational obligation with less extensive information than if the grievance involves a large number of employees or presents a question of major significance. Contrary to the FLRA's approach in this case, it is not necessary, nor is it realistic, to investigate every grievance to the nth degree. The question is not whether the information permits a perfect answer to every question possibly raised by the grievance, but whether the information is *adequate* to resolve reasonably the grievance at hand. Consideration of the relative significance of the grievance involved is particularly appropriate in this case because the only issue was the individual fairness of one evaluation for one employee. The union could have reasonably determined the fairness of the Border Patrol's evaluation with far less information than it actually demanded and the FLRA has ordered.[3]

---

[3]We are not the only court to conclude that the FLRA has been using the wrong standard to determine whether an agency must furnish information under 5 U.S.C. § 7114(b)(4). In three recent cases, the D.C. Circuit held that the FLRA misinterpreted the FSLMRS's necessity requirement when it equated relevant information with necessary information. *Department of Air Force v. FLRA,* 956 F.2d 1223 (D.C.Cir.1992); *NLRB,* 952 F.2d at 523; *Department of Justice, Bureau of Prisons v. FLRA,* 988 F.2d 1267 (D.C.Cir.1993). The D.C.Circuit held that, under the necessity standard, an agency must furnish information relating to the guidance, advice, counsel or training of management officials if the union can demonstrate some particularized need for the information. In addition, the court found that the necessity standard "implicitly recognizes countervailing interests because a "need,' by definition, is an interest of particular strength and urgency." *NLRB,* 952 F.2d at 531. We agree with the D.C.Circuit in these particulars.

We now turn to the question whether this information was reasonably available. In this case, the FLRA held that the information was reasonably available because the Border Patrol had "failed to establish that the requested information was available only through extreme or excessive means." Furthermore, in one of Marren's previous information requests, the FLRA found that the information was reasonably available because the Border Patrol had not shown that its "primary mission or budget were adversely affected" by its efforts to retrieve the documents that the union had requested. *Border Patrol II*, 40 FLRA at 805.

The FLRA, we think, is off the mark in its fashioning of a "reasonably available" standard; it practically ignores the "reasonableness" quotient that the statute requires.[4] If, for example, the availability of documents were considered along a continuum, with documents that are readily available at one end, and documents that are available only through "extreme or excessive means" at the other end, the FLRA has fashioned a standard that places "reasonably available" at the far end of that spectrum. We think that the "reasonably available" standard certainly implies something more moderate—something nearer the middle of the spectrum. Furthermore, the FLRA's previous articulation of a standard—"primary mission or budget not affected"—is no better. It suggests that documents are reasonably available as long as the documents can be provided without additional funds from Congress to carry out the agency's primary mission. Both of these interpretations of the statute are contrary to Congress's stated goal of promoting efficient government. *See* 5 U.S.C. § 7101(b). In the case before us, the Border Patrol would have to remove several employees from their regularly assigned duties for several weeks to search for, collect, collate, and redact thousands of pages of documents in various locations around the world. By any objective standard, this

---

[4]The FLRA suggests that we should defer to its interpretation of the statute because the FLRA has particular expertise in this area. As noted above, we find that the FLRA's interpretation of the statute is neither reasonable nor supportable. Furthermore, the FLRA's interpretation of the statute conflicts with its own regulations. The FLRA's regulations provide that the party charging a federal agency with committing a ULP has "the burden of proving the allegations in the complaint by a preponderance of the evidence." 5 C.F.R. § 2423.18 (1991). In its interpretation of the reasonably available standard, however, the FLRA shifts the burden of proof to the party defending the ULP charge. We have long held that federal agencies must abide by their own regulations. *See Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir.1979) (citing *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957)).

information was not reasonably available.

In this case, we do not, nor do we think that we should, establish a bright line rule for determining when information is "reasonably available." It is up to the FLRA to determine, on a case-by-case basis, whether information is reasonably available. We do think, however, that the requirement that documents be reasonably available is a separate and distinct requirement from a determination of whether data is "necessary," and that it must be considered separately and independently when evaluating a union's demand for data. We acknowledge that it may sometimes be appropriate to consider the importance of the purpose of the documents in order to weigh the reasonableness of the effort required to provide the requested information. Nevertheless, in evaluating the reasonable availability of documents, the FLRA should focus primarily on the efforts required to make the documents available, including costs and displacement of the agency's workforce. Finally, we think that when evaluating the workforce requirements and the other related costs needed to produce the data, the FLRA should at all times keep in mind Congress's stated goal of maintaining effective and efficient governmental operations; otherwise the FLRA is unfaithful to this express congressional directive.

V

For all of the forgoing reasons, we REVERSE the FLRA's decision and DENY the FLRA enforcement of its order.

REVERSED and ENFORCEMENT DENIED.