409 F.2d 1115
 133 U.S.App.D.C. 198
 SUPERIOR OIL COMPANY et al.
v.
Stewart L. UDALL, Secretary of the Interior, Appellant,
Union Oil Company ofCalifornia.
SUPERIOR OIL COMPANY et al.
v.
Stewart L. UDALL, Secretary of the Interior, Union Oil
Company of California, Appellant.
 Nos. 22192, 22194.
 United States Court of Appeals District of Columbia Circuit.
 Argued Nov. 8, 1968.
Decided Jan. 6, 1969.
 
 Mr. Robert M. Perry, Atty., Department of Justice, with whom Messrs. Edmund B. Clark and Thomas L. McKevitt, Attys., Department of Justice, were on the brief, for appellant in No. 22,192.
 Mr. Roger H. Doyle with whom Mr. E. W. Cole was on the brief, for appellant in No. 22,194.
 Mr. Abe Krash, Washington, D.C., with whom Messrs. Thurman Arnold and Daniel A. Rezneck, Washington, D.C., were on the brief, for appellees, Superior Oil Company, et al.
 Before BURGER, TAMM and ROBINSON, Circuit Judges.
 BURGER, Circuit Judge:
 
 
 1
 These appeals challenge a judgment of the District Court which permanently enjoined the Secretary of the Interior from issuing an oil and gas lease on certain public lands to Union Oil Company of California and directed that such lease be issued to Superior Oil Company, Ashland Oil and Refining Company, Canadian Superior Oil Company (U.S.) Ltd., General Crude Oil Company, Highland Oil Company, Kerr-McGee Corporaton, texas Eastern Transmission Corporation and Transocean Oil, Inc., collectively described hereafter as Superior.
 
 
 2
 Sealed bids were duly called for by the Secretary of the Interior for the sale of certain oil leases and when bids were opened it developed that the document purporting to be Union's sealed bid of $13,600,000 was not signed but that the next highest offer made by Superior, was $11,628,691.20 and was signed and otherwise in full compliance with the statute, the regulations and the Notice of Sale. At this point the officer opening the bids announced: 'The next bid, gentlemen, I regret to announce * * * is not acceptable * * * it has not been signed.'[1] The bidding officer nevertheless retained the checks submitted by both Union and Superior and subsequently the Secretary declared that Union was the highest qualified responsible bidder. After the District Court entered a temporary restraining order which prevented the Secretary from issuing a lease to Union, the Secretary tendered return of Superior's funds which he had deposited in a 'suspense account.' Superior refused the tender and demanded that a lease be issued to it as the highest bidder.
 
 
 3
 (1)
 
 
 4
 The detailed facts essential to our consideration can best be reflected in a summary of the Findings of Fact of District Judge Sirica, which are as follows:
 
 
 5
 (1) That the Department of the Interior duly published a Notice of Sale of leases for the tracts in question pursuant to statutes and regulations fixing the time and place for filing an opening of bids as May 21, 1968 at 10:30 a.m.;
 
 
 6
 (2) The Notice required bids to be filed pursuant to the regulations (43 C.F.R. 3382, j.) which provides that 'leases will be awarded to the highest qualified bidder on the basis specified in the notice of lease offer.' The Notice called for sealed bids and required that the bid for each tract be in a separate sealed envelope. The notice also set forth a sample form of bid and prescribed that it be signed by an authorized officer. One fifth of the bid price was to accompany each bid.
 
 
 7
 (3) Superior's bid complied with all requirements of the Notice, statutes and regulations.
 
 
 8
 (4) Union submitted a document in a sealed envelope offering $13,600, 000 with a tendered check of $2,720,000 in the envelope but the purported bid within the sealed envelope was not signed by any officer of Union; a cover or transmittal letter accompanied the sealed envelope and described the latter as Union's bid.
 
 
 9
 (5) Pursuant to the Notice of Sale all bids were opened May 21, 1968, at 10:30 a.m. in a public meeting in New Orleans conducted by a Mr. Rankin, Manager of the Bureau of Land Management Department of the Interior. Order No. 575 of the Department, dated October 13, 1954 (19 Fed.Reg. 6720) authorized Rankin to take all actions in connection with leases. Pursuant to regulation, he also had the power to reject bids (43 C.F.R. 3382.5).
 
 
 10
 (6) Nine bids were received and after the opening Rankin announced that Union's tender (although apparently the highest) was 'not an acceptable bid' because it 'had not been signed.' At the same time Rankin stated that Union's tender was an 'unacceptable bid.'
 
 
 11
 (7) Superior's bid was higher than any tender except that of Union.
 
 
 12
 (8) On the sixth day thereafter, May 27, the draft submitted by Superior for $2,325,738.24 was deposited for collection in a bank with the endorsement of the Department of the Interior for the account of the United States. In accordance with practice and regulations, checks of all bidders lower than Superior were returned uncashed to unsuccessful bidders. The draft tendered by Union was similarly held and deposited by the Secretary in a suspense account pending the Secretary's administrative decision as to the status of Union's bid.
 
 
 13
 (9) A right to an administrative appeal is provided by the regulations for those whose bids are rejected but Union did not take an appeal from Rankin's announced decision of May 21, 1968 that Union's documents were 'unacceptable' because unsigned.
 
 
 14
 (10) On June, 1968 the Secretary announced his decision that the bid made by Union was valid. The District Court on June 18, 1968 per Chief Judge Curran issued a Temporary Restraining Order enjoining the Secretary from executing a lease to Union and on July 3 this was made a preliminary injunction by an order of Judge Corcoran.
 
 
 15
 Other findings related to the irreparable injury to Superior if Union secured a lease, took possession and began drilling operations and in light of our disposition they need only be noted by reference to the more detailed Findings of Judge Sirica.
 
 
 16
 From these Findings of Fact the District Court concluded that:
 
 
 17
 (a) Sealed bids must be signed authoritatively. (b) Signing of the sealed bid is a matter of substance and failure to do so cannot be waived by the Secretary nor supplied by amendment of the bid after opening. (c) Union did not submit a valid bid and was not a 'qualified bidder' under the statute, the regulations and the Notice of Sale. (d) Union's purported bid was rejected by an authorized officer of the Department of the Interior on May 21, 1968. (e) Superior complied with all provisions of the statute, the regulations and Notice of Sale. (f) Superior was the 'highest responsible bidder' and hence the 'successful bidder.' (g) Superior's bid was accepted by endorsing and cashing its draft and it is entitled to receive the lease and that the Secretary has a duty to issue the lease. (h) Other conclusions related to Superior's standing to sue, that the United States was not an indispensable party and that Superior would be irreparably injured unless it received the lease.
 
 
 18
 If the dispositive Findings of Fact are supported by evidence this court is obliged to affirm; indeed we are bound to affirm unless the District Court is 'clearly erroneous.' F.R.Civ.P. 52(a).
 
 
 19
 Union contends its bid consists of the paper containing an offer of $13,600,000.00 under seal and the transmittal letter which was signed by an authorized officer.[2]
 
 
 20
 Superior contends that a valid bid responsive to the Secretary's Notice of Sale must be complete in the papers which are sealed and cannot be aided by an extraneous paper; that the bidding officer rejected Union's bid by declaring it 'unacceptable' because it was unsigned; and, finally, that the Secretary accepted its bid by retaining the Superior check and depositing it to the account of the Treasury of the United States after returning bid checks to all bidders whose bids were lower than those of Superior and Union.
 
 
 21
 The Secretary contends that he is not bound by the acts or utterances of Rankin, Manager of the New Orleans Outer Continental Shelf Office, Bureau of Land Management, at the time of opening the bids. The section of the regulations applicable to the award of leases, 43 C.F.R. 3382.5, provides:
 
 
 22
 Following the public opening of the sealed bids as provided in the notice of lease offer, the authorized officer, subject to his right to reject any and all bids will award the lease to the successful bidder.
 
 
 23
 The language of this provision demonstrates that it is the 'authorized officer' who has the right to reject bids. The only inquiry then becomes one of discerning the individual who is clothed with the rights of the 'authorized officer.' For this determination, we turn to Department of the Interior Order No. 575, October 13, 1954, 19 Fed.Reg. 6720:
 
 
 24
 The Manager Outer Continental Shelf Office is authorized to take all actions in connection with the following:
 
 
 25
 (1) Mineral leases of submerged lands of the Outer Continental Shelf.
 
 
 26
 (b) Mineral leases pursuant to the act of August 7, 1953 (67 Stat. 462; 43 U.S.C. 1331 et seq.), and the regulations under 43 CFR Part 201 (now 43 C.F.R. Subpart 3382).
 
 
 27
 We therefore see that Rankin was in fact the 'authorized officer' who had the authority to 'reject any and all bids' and that his characterization of Union's bid as 'not an acceptable bid' was not subject to correction as the Secretary asserts. We will later deal with the question whether the Secretary expressly or impliedly accepted Superior's bid.
 
 
 28
 Having in mind the large sums involved, the large public interest in precision and secrecy of bids for the sale of public land leases, and in the careful procedures called for, the bidders and the public have a substantial interest in certainty. This underlies the detailed procedures provided in the regulations. The need for precision, care and certainty is underscored by the fact that the interest at current permissible rates on the funds of Union and Superior which are immobilized during the pendency of this litigation amount to more than $800 per day; thus bidders and the public have an acute economic interest in having bids resolved surely and swiftly. This consideration caused Chief Judge Curran to expedite the trial of this case and Judge Sirica as trial judge to expedite its disposition. We have similarly given priority to these appeals.
 
 
 29
 (2)
 
 
 30
 The controlling regulations specifically contemplate that bids must be sealed and signed. 43 C.F.R. 3382.4(a)(1). Likewise, the Notice of Sale specifically required all bids to be submitted in accordance with the regulations and set out a form bid which contained a provision for the signature of the bidder. Indeed, the Secretary acknowledged in his opinion in this case that signing of bids
 
 
 31
 'is a matter of substance. Thus, the deficiency in Union's bid cannot be waived, nor can it be supplied after the time for receipt of the bids.'
 
 
 32
 We think these authorities and the Secretary's entirely correct conclusion as to 'substance' and 'waiver' undermine his present argument that he has the power to make an unreviewable administrative determination as to the legal consequence of Union's unsigned sealed bid. Judicial deference to administrative agencies when dealing with matters peculiarly within their expert experience is appropriate but the regulations involved here raise questions of interpretation of statutes, regulations and bids which are obviously well within the competence of courts.
 
 
 33
 Not surprisingly the subject of bidding procedures has been given close attention by the Comptroller General whose view is that
 
 
 34
 'the strict maintenance of the competitive bidding procedures required by law is infinitely more in the public interest than obtaining a pecuniary advantage in individual cases by permitting practices which do violence to the spirit and purpose of the law. Conditions or reservations which give a bidder a chance to second-guess his competitors after bid-opening must be regarded as fatal to the bid.' 34 Comp.Gen. 82, 84, B-120436 (1954).
 
 
 35
 Thereafter, dealing specifically with the signature problem the Comptroller General said
 
 
 36
 'If the bidder chooses to remain silent after the opening of bids he could disavow the bid because of the absence of a signature. This would place him in a position to make an election either to abide by his bid or to claim that the bid was submitted in error by a person without authority to enter into contracts on behalf of a bidder. This would give him more than one chance under the same invitation. Moreover, when a bid is nonresponsive in a material respect, it cannot be corrected even though the nonresponsiveness may be due to mistake or oversight.' Comptroller General, B-160856, March 16, 1967, p. 3.
 
 
 37
 It is not inconceivable that a high bidder in circumstances such as here who found he had made an improvident bid substantially higher than that of other bidders could well seek to exploit every arguable thesis to rid himself of the burden of what he concluded was an undesirable offer.
 
 
 38
 The Secretary's staff has acknowledged the importance of strict adherence to procedure, ruling in another case
 
 
 39
 'The responsibility for filing a proper offer is the offeror's. Only by rigid enforcement of the rules can the Department insure orderly procedure and fairness to all applicants.' W. R. Stephens, Department of the Interior, Bureau of Land Management, Misc. 85801, August 15, 1962.
 
 
 40
 The Secretary points to the fact that Union's bid will produce approximately two million dollars more in immediate revenue for the government. Obviously this is of substantial importance. By the same token it may well be that if the Secretary now rejected all bids and began anew, the bidders, having exposed their interest and evaluation of the leases, might decide to submit higher bids on a new notice of sale. However, there are other significant considerations which must be weighed and which have important implications beyond this particular transaction; they are factors which affect the integrity of the entire governmental program of selling oil leases on public lands and indirectly indeed the whole process of making public contracts by the process of sealed bids. In the area of public contracts where billions are involved in public building, an accretion to the government of even two million dollars can be a manifestation of a short-sighted 'penny-wise, pound-foolish' policy if it is allowed to control all decisions.
 
 
 41
 The Secretary's concern over the differential between Union and Superior is understandable but we think it misses the central legal issues and the important public policy underlying strict rules in bidding. It is also very important that bidders who comply faithfully and scrupulously with bidding regulations should not in effect be penalized by the errors of less careful bidders who fail to follow correct procedures. This would be a consequence of the Secretary's now casting out all bids and beginning again because of the infirmity in Union's bid.
 
 
 42
 The requirement of steadfast compliance with competitive bidding procedures comports best with the need to promote the integrity of the bidding process. Although such a stance may entail some limitation on the Secretary's discretion, it seems clear that this is an indispensable ingredient to the maintenance of competitive bidding processes which will engender public confidence and that of persons dealing with the Government.
 
 
 43
 For similar reasons we reject the argument that Union's 'deficiency' may be cured by incorporation by reference to the signed transmittal letter which was not submitted with the secrecy guaranteed by sealing. It is quite true, as argued by the Secretary, that a valid contract can be spelled out of multiple papers, some unsigned, if they are referred to in a signed document and thus become incorporated by reference. But this hornbook principle of contract law does not control over specific regulations implementing a carefully constructed scheme of sealed bids in public contracts.
 
 
 44
 No authority has been cited and we discover none which compels or even contemplates the use of materials extraneous to the sealed bid to remedy deficiencies in the sealed bid itself. In support of his position, the Secretary calls forth the 'settled rule of Government contract law that an unsigned bid may be considered for an award if accompanied by a letter, bond, or other document signed by the bidder clearly evidencing his intent to submit the bid.' The short answer to this is that the cases relied on by the Secretary[3] did not involve bidding under regulations such as are controlling here. General rules of Government contract law must give way to the specific regulations and Notice of Sale governing this kind of transaction in the same way that common law contract principles must yield to the extent that they are inconsistent with governing regulations.
 
 
 45
 We hold that in the context of competitive bidding the Secretary may not resuscitate an unsigned bid either by construing the regulations or by relying on general principles of Government contract law.
 
 
 46
 (3)
 
 
 47
 The only remaining question is the propriety of the District Court's ordering the Secretary to issue the lease to Superior. Section 8 of the Outer Continental Shelf Lands Act, 43 U.S.C. 1337(a) (1964), provides that the Secretary of the Interior 'is authorized to grant to the highest responsible qualified bidder by competitive bidding * * *.' The use of the word 'authorized' indicates that the Secretary has discretion in granting leases and is not required to do so. He might for example have rejected all bids on the ground that none was in the public interest, but if this had been indicated it was a decision which he was obliged to make at the time, not as an after-thought with the result that Union and other bidders would have 'another bite at the apple.' It seems clear on this record that had Union submitted no bid at all, Superior would have been awarded this lease as the highest responsible qualified bidder[4] since it is implicit in the retention of both Union's and Superior's checks and returning all others, that the Secretary determined that both Union and Superior were responsible qualified bidders. This was a reasonable course to follow so that if the Secretary ultimately decided that Union's bid was defective he had another bid on which to rely to make an award. It would be plainly inequitable to Superior and damaging to the long range public interest in the integrity of the bidding process to allow Union, whose error was created this problem, to have a second opportunity to bid against Superior and all other bidders.
 
 
 48
 We therefore hold that the District Court findings and conclusion that Superior was the 'highest responsible qualified bidder' are amply supported by the evidence of the Secretary's action in accepting and holding Superior's check in the circumstances shown by this record. The judgment of the District Court is therefore.
 
 
 49
 Affirmed.
 
 
 
 [1]
 Excerpts from a tape recording of the opening of the bids contains the following remarks made by Mr. Rankin, referring to Union's bid:
 'The next bid * * * Gentlemen, I regret to announce that the next bid is not an acceptable bid. It has not been signed.
 Gentlemen, the * * * the * * * unsuccessful bid, or rather the * * * the * * * unacceptable bid, was a bid that was not signed and it was * * * ah * * * in an amount greater than the highest bid that I read.'
 JA 16 & 84.
 
 
 [2]
 Appellant Union also urges that the United States is an indispensable party but nowhere in the briefs of the Attorney General filed on behalf of the Secretary is this claim urged. Apart from all other aspects, including the need to have the United States before us in order to afford relief, the absence of any contention on this point by the Attorney General suggests we need not deal with the claim
 
 
 [3]
 The Secretary has cited the following cases to this court: 'Girard (Life) Insurance Company v. Cooper, 162 U.S. 529, 543 (16 S.Ct. 879, 40 L.Ed. 1062) (1896); Commercial Standard Ins. Co. v. Garrett, 70 F.2d 969, 974 (C.A. 10, 1934); Woodbury v. United States, 192 F.Supp. 924, 935 (D.Ore.1961), aff'd., 313 F.2d 291 (C.A. 9, 1963); Hillcrest Inv. Co. v. United States, 55 F.Supp. 147, 149 (W.D.Mo.1944), aff'd, 147 F.2d 194 (C.A. 8, 1945).' (Reply Brief for Secretary at 3)
 In his memorandum, which he described as constituting 'a final departmental decision' (JA 193), directing the Bureau of Land Management to issue a lease to Union should the consideration be found adequate, the Secretary stated:
 It is a settled rule of Government contract law that an unsigned bid may be considered for an award if accompanied by a letter, bond or other document signed by the bidder clearly evincing his intent to submit the bid. 17 Comp.Gen. 497 (1937), 34 Comp.Gen. 439 (1955), 36 Comp.Gen. 523 (1957). (JA 192).
 
 
 [4]
 The nine bids were as follows:
 Union ............... $13,600,000.00
 Superior ............. 11,628,691.20
 Shell Oil ............. 6,804,691.00
 Atlantic Richfield .... 4,221,460.00
 Texaco ................ 3,386,880.00
 Humble ................ 2,805,120.00
 Marathon .............. 1,503,360.00
 Chevron ............... 1,186,560.00
 Sun Oil ................. 744,710.40
 JA 16, 84, 195