**AIR TERMINAL SERVICES, INC.,**
**Plaintiff,**

v.

**The DEPARTMENT OF TRANSPORTA-**
**TION et al., Defendants.**

**Civ. A. No. 2141–72.**

United States District Court,
District of Columbia.

July 12, 1973.

David Machanic, David S. Black, Washington, D. C., for plaintiff.

Robert M. Werdig, Jr., Asst. U. S. Atty., Washington, D. C., for defendants.

MEMORANDUM ORDER

JUNE L. GREEN, District Judge.

This suit was brought by the "best" bidder among five companies which responded to FAA's RFP for the food and beverage concession at the Washington National Airport. All bids were due and

filed by August 16, 1971. The five bidders were:

ATS, Inc.
Automatic Retailers of America, Inc.
Gladieux Food Services, Inc.
Host International, Inc.
Marriott Corp.

Thereafter, negotiation sessions were had with each of the five bidders—one negotiation each day. No bidder requested more time or information. Each company was informed that it had until October 11, 1971 (later modified to October 12, 1971, due to legal holiday), to put in its last and best offer. All five companies responded by that date.

October 22, 1971, a representative of Marriott Co. telephoned Mr. C. R. Melugin, previously manager of Washington National Airport and at that date, Acting Manager of National Capital Airports (Washington National and Dulles), now Deputy Director of Flight Standards FAA, advising him that it was considering making an offer increasing its minimum guarantee. Marriott Co. was informed that the date of October 12 (to which Marriott had previously responded) was the closing date and no further negotiation would be entertained. (Marriott never submitted a written offer after October 12th). The General Counsel agreed with Mr. Melugin that Marriott's proposed additional offer was too late to be considered. The Evaluation and Negotiation Committee, made up of engineering, audit, legal and financial personnel, convened October 21, 1971. It voted 4 votes for ATS, 1 vote for Automatic Retailers of America, Inc. and 1 vote for Host International, Inc. November 16, 1971, Mr. Melugin transmitted to the Chairman of the Contracts Award Board the report of the Evaluation and Negotiation Committee, together with his recommendation, as head of the procuring activity, that the award be made to ATS.

November 17, 1971, Mr. Melugin acknowledged receipt of derogatory information from Congressman Steiger concerning Emprise Corp. and its possible connection with ATS, which information he forwarded to FAA's General Counsel.

December 28, 1971, Mr. Melugin explained to the Chairman of the Contracts Award Board the necessity for the contract to run ten years, since the concessioner was required to invest 2 million dollars in improvements, and cited the 54 Stat. 1030, 1039 permitting same. In addition, he included a detailed statement with regard to the history of the contract action and support for his and the Committee's recommendation.

January 19, 1972, Marriott, by letter, requested withdrawal of its proposal. Mr. Melugin granted this request.

January 26, 1972, Mr. James T. Murphy, Director of Air Transportation Security, wrote a memo. to the Administrator of FAA making known to him allegations he had received against Air Terminal Services, Inc. due to its being a subsidiary of Sportservice, which is in turn a subsidiary of Emprise Corp. Mr. Murphy stated *inter alia* "No derogatory information has been developed concerning ATS". Then he recommended that the Administrator have the Office of Audit carefully review the evaluation and negotiations.

Upon receipt of the aforesaid memo. the FAA Administrator wrote on it the following: "Jim, Can you Prove? If not lets award to [Air Terminal Services] (arrow and underlining) J. H. S." See plaintiff's Exhibit No. 25.

Thereafter a determination was made by the General Counsel that the derogatory allegations did not constitute a reason to deny ATS the contract. Nevertheless, the Administrator's recommendation was not followed.

Next, representatives of the Office of Audit and the Chief, Contracts Division, Logistics Service, undertook a study of the procurement process and sought to identify technical errors therein. This Court heard the testimony of these men and observed them on the witness stand. They could not agree with each other as to what the technical flaw was but in-

sisted that there were flaws. Most of these alleged flaws seemed to concern themselves with Marriott which had voluntarily withdrawn, had filed no letter of complaint or formal protest, and *no other bidder* had complained. Further, Marriott was not even second, third or fourth place in the bidding.

March 1, 1972, Mr. Melugin provided the Director of Logistics Service with the proposed contract, the individual grading by each member of the Evaluation Committee, all five bidders' original and revised proposals, memos from the FAA General Counsel, evaluation criteria used by the Committee, etc. and he stated "The submission of this action to your office was delayed due to certain administrative review which has now been completed". Again he requested its approval.

All of the questions raised by Audit, Contracts and Logistics were answered by Mr. Melugin in plaintiff's Exhibit No. 22. His response cited sections in FAA's Procurement Handbook authorizing the questioned actions and all of the details of negotiations were further spelled out. This exhibit is attached hereto and incorporated herein [omitted from Opinion as published].

Meanwhile, the previous food concession contract at National Airport had run out as of December 31, 1971, and ATS was continuing to run the concession on 60-day agreed extensions.

Internal dissension continued at the FAA with regard to the derogatory allegations against ATS due to Emprise Corporation's conviction in California.

Finally, June 19, 1972, a memo from Mr. Cadigan, Chief, Financial Management Staff, to Mr. Mahaney, successor to Mr. Melugin, indicated that ATS was not a responsible bidder, that all bids should be rejected and the concession readvertised.

On July 27, 1972, Mr. Mahaney sent a memo to National Capital Airports stating that ATS should not be permitted to bid on the new RFP.

August 29, 1972, Mr. Mahaney wrote to ATS stating the previous RFP was cancelled due to "delay in arriving at a decision in the award of this contract, the timeliness of payment offers and dollar investment arrived at almost a year ago", etc. No mention was made to ATS of NCA's determination to debar ATS from bidding on the new RFP.

Thereafter, ATS on September 11, 1972, protested to the Comptroller General of GAO (through its General Counsel) and on September 18, 1972, a letter was sent to Mr. John H. Shaffer, FAA Administrator, seeking a resolution of the matter as well.

The Court has not had the benefit of any report or response by the GAO Comptroller.

Motions for a Temporary Restraining Order and Preliminary Injunction and Complaint for Permanent Injunction were filed in this Court October 26, 1972, seeking cancellation of new RFP and award to plaintiff of contract under the original RFP.

The Temporary Restraining Order was heard and denied without prejudice on October 31, 1972. It was ordered at that time that plaintiff be afforded the information available to others and permitted to bid on a new RFP if a new one were advertised. (Although this was complied with, defense counsel has stated that he made no representations to the Court that ATS' bid on the new proposal would be considered.)

This same Order required the defendants and their attorneys to refrain from disclosing any of the contents of plaintiff's president's affidavit and ordered the statement sealed.

On December 26, 1972, defendants filed a Motion for Summary Judgment and attached as exhibits all of the proposals, dollar amounts and comparisions of revenues of plaintiff and other bidders. Although this erroneous disclosure was discovered by defense counsel January 5, 1973, these documents remained open to the public nearly a month, until January

24, 1973, contrary to government procurement regulations and intent of this Court. To allegedly "cure" this problem, the government has made all of these confidential bids available to all bidders on the new RFP.

■ This Court has had the opportunity to hear 13 witnesses for the plaintiff and to observe them on the stand. It has also had the opportunity to hear and observe two witnesses for the defendant. Throughout the evidence and testimony of the "overseers" ran the thread of concern for the responsibility of ATS due to Emprise's difficulties. Surely this is a legitimate concern and one which should be resolved. The procurement regulations provide for the manner that this be determined which permits the charged company a hearing and other constitutional safeguards.[1] There is little doubt that defendants wanted to avoid this issue and used insubstantial flaws in the negotiations to disqualify ATS. (One of defendant's witnesses testified that there had never been a 100% perfect contract negotiation).

The Court is not impressed with the government's allegation that it was entitled to cancel the original RFP because it contained the following clause: "Right to reject any and all proposals upon determining that it would be in the best interest of the government to do so". Surely it was not contemplated that this would be raised for the first time over 13 months from the date of original solicitation.

The changed circumstances which the government relies upon in stating its reasons to plaintiff were caused entirely by defendants' own unwarranted delay and are not matters that were beyond contemplation or negotiation in the original RFP.

*Conclusions of Law*

In *Kentron Hawaii, Ltd. v. Warner et al*, 156 U.S.App.D.C. 274, 480 F.2d 1166, 1973, the United States Court of Appeals for this Circuit enunciated the general doctrine with respect to adversely affected bidders who challenge the procurement decisions. That Court stated,

"Ever since *Scanwell Laboratories, Inc. v. Shaffer* [137 U.S.App.D.C. 371, 424 L.2d 859], those adversely affected by the award of government contracts have had standing to challenge the legality of procurement decisions. However, they bear a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Steinthal & Co. v. Seamans*, 147 U.S.App.D.C. 221, 455 F.2d 1289; *Wheelabrator Corp. v. Chafee*, 147 U.S.App.D.C. 238, 455 F.2d 1306."

In the present instance, the plaintiff qualifies on both grounds. First, the procurement official's decision was irrational since it reversed the recommendation of FAA's Evaluation and Negotiation Board for reasons of non-responsibility without complying with requirements set forth in the procurement regulation 1–1.604–1(a) & (b).

Second, plaintiff was competitively injured by the government's disclosure of its bid details which was contrary to the expressed intent of this Court and Federal Procurement Regulations.[2] Plaintiff was the successful bidder in the original RFP and the only competitor with practical experience in operating the food and beverage concession at the Washington National Airport. It is obvious that the details of its proposal constituted valuable commercial information.

■ A bidder is entitled to be treated fairly and legally, and not arbitrarily, unethically and illegally. *Superior Oil*

---

1. Fed. Procurement Regulations 1–1.604–1(a) & (b).

2. Chap. 1–3.804 provides: "Cost and profit figures of one offeror or contractor shall not be revealed to other offerors or contractors."

*Co. v. Udall,* 133 U.S.App.D.C. 198, 409 F.2d 1115.

Wherefore, after consideration of the affidavits, evidence adduced, testimony and arguments of counsel, it is by the Court, this 11th day of July 1973,

Ordered

(1) That ATS be awarded the contract under the original RFP.

(2) However, if the defendants contend that ATS is non-responsible, action under the procurement regulations shall be taken to set a hearing to determine this issue forthwith.

(3) That the bids under the new RFP be held in abeyance until plaintiff's responsibility be determined if defendants intend to raise the question.