The STATE of Wyoming; Sidney C. Werner, Director, Department of Administration and Fiscal Control; Robert Skyles, Administrator, Purchasing and Property Control; Randolph Wood, Director, Department of Environmental Quality; Roger Shaffer, Administrator, Land Quality Division, Appellants (Defendants),

v.

WEISZ & SONS, INC., Appellee (Plaintiff),

Eby Mine Services, Inc., Appellee (Intervenor).

No. 85–210.

Supreme Court of Wyoming.

Jan. 21, 1986.

Allen C. Johnson, Sr. Asst. Atty. Gen., Cheyenne, for appellants.

David H. Carmichael of Carmichael, McNiff & Patton, Cheyenne, for appellee.

Don W. Riske, Cheyenne, for intervenor.

Before THOMAS, C.J., ROONEY,* BROWN and CARDINE, JJ., and RAPER, J., Retired.

RAPER, Justice, Retired.

The State of Wyoming, appellant, Department of Environmental Quality (DEQ), appellant, through the Department of Administration and Fiscal Control (DAFC), appellant, solicited and received bids for the performance of a contract to inject slurry underground to backfill mine voids for subsidence control at Hanna, Wyoming. Weisz & Sons, Inc. (Weisz), appellee, was the low bidder but was disqualified by DAFC upon recommendation of DEQ, after evaluation of bids, for not being responsive in its bid. DEQ, through DAFC, then accepted the bid of the second low bidder, Eby Mine Services, Inc. (Eby), intervenor in the district court.[1]

Weisz sought and obtained a temporary restraining order in the district court to

---

* This case was heard and decided prior to the retirement of Justice Rooney on November 30, 1985.

1. While Eby is named in the caption of this case as an appellee, its position is the same as that of appellants. Eby did not appeal from the district court's grant of a permanent injunction which

set aside the award of contract to it. It appears that this Court through oversight permitted Eby to file a brief and appear and present oral argument which we must now disregard. A nonappealing party cannot attack a judgment. *Doenz v. Garber*, Wyo., 665 P.2d 932 (1983). Eby will, however, as a nonappealing party have

restrain the appellants from awarding the contract pending a trial on the merits. After trial, the trial judge rendered a written opinion devoted in practically its entirety to an analysis of the evidence with an ultimate finding that "it was an abuse of discretion by the officials evaluating the bids, to hold that the omission of such documentation from plaintiff's bid amounted to a material variance sufficient to reject the bid."

The district court then permanently enjoined appellants from awarding the contract to anyone other than Weisz.

The appellants state the issues to be:
"1. Is the State of Wyoming immune from a suit such as this?
"2. If the State is not immune from a suit for injunction, then did the Appellee carry the heavy burden of proof placed on him?
"3. Could the District Court have treated this case as judicial review of agency action under the Administrative Procedures Act?
"4. As a matter of policy, should the courts refrain from reviewing day-to-day decisions of executive branch agencies when those decisions are discretionary?"

Weisz considers the issues to be:
"I. Whether sovereign immunity precludes district court jurisdiction over

state agencies and state officials in 'disappointed bidder cases.'
"II. Whether the district court may afford injunctive relief in this case, pursuant to Wyoming Statutes and the Wyoming Rules of Appellate Procedure."

We are satisfied that the only issue is whether under the circumstances of this case the district court has authority to substitute its discretion for that of DAFC and DEQ and award a contract for injection of slurry through use of an injunction. Since our decision on this issue is dispositive of the appeal, we need not consider any other question.

We will explain and confirm the order of reversal heretofore entered on October 31, 1985.

■ Legislative direction for state contracting appears in W.S. 9–2–1016(b)(viii) and (xiv) [2] governing bidding and contracts required by agencies. DAFC is required to establish uniform standards governing such agency action and standard forms of bids and contracts "sufficiently designed to permit award on the basis of the lowest *evaluated* price as determined in accordance with objective, measurable criteria set forth in the invitation for bids." (Emphasis added.)[3] DAFC followed through and adopted a set of purchasing rules.

> "(A) Bids or contracts for supplies, materials or services in excess of one thousand five hundred dollars ($1,500.00) shall be made by competitive sealed bidding when the configuration or performance specifications, or both, are sufficiently designed to permit award *on the basis of the lowest evaluated price as determined in accordance with objective, measurable criteria set forth in the invitation for bids,* and when available sources, the time and place of performance, and other conditions are appropriate for the use of competitive sealed bidding; * * *" (Emphasis added.)

---

any benefits flowing to it from this Court's decision. *Kure v. Chevrolet Motor Division,* Wyo., 581 P.2d 603, 610 n. 9 (1978).

**2.** W.S. 9–2–1016(b)(viii) and (xiv) direct that DAFC shall:

"(b) * * * The department through the purchasing and property control division shall:

   *    *    *    *    *    *

"(viii) Establish uniform standards governing bidding, blanket agreements, contracts, services and estimating procedures for obtaining supplies, materials, equipment or services required by agencies;

   *    *    *    *    *    *

"(xiv) Establish and adopt standard forms and procedures providing that bids or contracts for supplies, materials or services shall be awarded through the use of competitive sealed bidding, competitive negotiation, noncompetitive negotiation or small purchase procedures as hereafter provided:

**3.** Contrary to the position of Weisz, an invitation or call for bids is not itself an offer, but rather the bid is an offer which creates no right until accepted. *Rapp v. Salt Lake City,* Utah, 527 P.2d 651 (1974); *Mottner v. Town of Mercer Island,* 75 Wash.2d 575, 452 P.2d 750 (1969).

The rules and regulations cover various statements of policy and advisories in aspects of procurement, such as the basic method being by competitive sealed bidding "in order to secure acceptable products at the lowest possible cost to the taxpayers of the State," the purpose being to encourage maximum open competition and "at the same time assure all agencies of quality supplies, materials, equipment or services; reasonable delivery and the best possible price." Section 3, Chapter II, Rules and Regulations, Department of Administration and Fiscal Control, Purchasing and Property Control Division. It is set out that the purpose of advertising a call for bids is to secure for the state the benefits from competition "and to prevent collusion and fraud in letting contracts." Section 3, Chapter V, Rules and Regulations, supra.

The work to be done on the project was made possible by a grant from the federal government, so DEQ and DAFC were also bound by applicable federal regulations in letting a contract. Such regulations appear in Circular A–102 (Revised), Uniform Requirements for Assistance to State and Local Governments, Office of Management and Budget, Executive Office of the President of the United States. Amongst the selection procedures there set out are minimum requirements for solicitation of offers and requiring competitive sealed bids for contracts over $10,000, with a public opening and "[a]ny or all bids may be rejected when there are sound documented business reasons in the best interest of the program." Procedures followed by DEQ and DAFC appear to conform to federal requirements.

Under the working arrangement between DAFC and the various agencies, the agency, DEQ in this instance, puts together the information necessary to call for bids. DAFC actually handles the procurement by advertisement, receiving bids, and the opening. The agency requesting a call for bids is then called upon in an advisory capacity for its recommendations for letting a contract.

Personnel of DEQ did not consider themselves technically qualified to compile the information necessary to advise DAFC of what was necessary to engage a qualified contractor to complete the slurry project. In order to provide that technical skill in drafting a call for bids, bidding specifications, project specifications and contract documents, DEQ employed the services of Midwest Mining Company. The project necessitated the drawing of bidding specifications and project specifications in order to obtain three contractors: one to drill holes from the land surface into the underground voids, another to gather and stockpile material for mixing with water into a slurry, and a third contractor to mix and inject the slurry through the holes and into the voids. Midwest Mining Company was to also furnish the project engineer on the job to coordinate the efforts of the three contractors so that, in the overall project, holes and materials will be available for the slurry contractor, as needed, to minimize down or standby time. The engineer, in addition, would oversee the work to assure compliance with the specifications and contract terms. Along with representatives of DEQ, Midwest Mining Company, through its engineers, was also to be part of the review process to perform the evaluation of bids received.

In accordance with its contract, Midwest Mining Company made a preliminary study and survey to acquaint itself and DEQ personnel with the project needs. It thereupon prepared specifications, a form of contract, a call for bids, bidding specifications, and bid forms for bidder response. The resultant bulky volume was submitted to DAFC, which it approved and advertised by the required means for soliciting offers.

Five bids were received:

| | |
|---|---|
| Mining Corporation | $3,001,187.00 |
| Northern Improvement Co. | 2,647,370.00 |
| Larry's Plumbing | 2,594,920.00 |
| Eby Mine Service | 1,775,375.00 |
| Weisz & Sons | 1,467,078.00 |

The engineers' preliminary estimate of project cost had been $2,264,950.

After evaluating the bids in accordance with the method of which prospective bidders were advised, in the call for bids furnished as part of the solicitation package, DEQ submitted the following report and recommendation to DAFC:

"The intention and interest of the State is to award this contract to the 'lowest qualified bidder.' In order to evlauate [evaluate] qualifications of bidders, materials provided as set out in Sections B–1F and B–1G of the bid proposal were used to establish the minimum requirements of being responsible and responsive. The information required by Sections B–1F and B–1G must be submitted with the bid as set out in Sections B and C of the bid proposal. The method of evaluation followed Section B–1J. Because of the complexity, knowledge and skills required for this work, extensive evidence was required to be submitted to demonstrate the bidders['] capabilities and qualifications.

"Upon initial evaluation of the apparent low bidders' proposal, (Weisz & Sons, Inc.), the following concerns, as related to the requirements of Sections B–1F and B–1B [B–1G], were noted:

"1. The bidder was to provide, as part of his bid, documentation from proposed supplies [suppliers] of equipment commitments on the availability of equipment. This documentation was not in Weisz & Sons['] bid.

"2. The bidder was to provide, as part of his bid, information on key personnel (project manager, site supervisors, forman [foreman]) including, the extent that senior personnel will be used on the project, the experience of each person, employment history, etc. Weisz did provide information on personnel but failed to describe the extent to which each senior person would be used on the job. Because the bid was lacking this information, we were unable to determine if Weisz & Sons would have qualified personnel (supervision) at the site at all times.

"3. Section B–1F and Section I–2.2.6 requires [sic] the bidder to indicate in his bids the means by which the backfill which is injected will be weighed, and the method and frequency of calibration of the measuring device. This is a very important part of the contract as the bulk of payment will rely on the measurement of materials injected. The bid specifications of Section I–3.3.6 establish criteria for the weighing device and its accuracy. Weisz's bid did include the type of scale to be used, but did not indicate the method or frequency of calibration.

"4. Section B–1G of the bid proposal requires the bidder to attach to his bid proposal a list of all subcontractors and the dollar amount of work that said subcontractors will perform under this contract. This requirement serves two purposes; one, to determine if the prime contractor has chosen qualified subcontractors and two, to show that the prime has used responsible dollar amounts for subcontract work to prepare his bid. Weisz's bid contained no list of subcontractors.

"On August 5, 1985, clarification was requested from Weisz & Sons with respect to the above concerns. The purpose of this inquiry was to further establish the responsiveness of the bid, i.e. the State wished to ascertain if Weisz had this information in his possession when he prepared his bid. Weisz's response was received on August 12, 1985.

"The additional information submitted by Weisz & Sons clearly showed that he had not developed and fully considered all required information prior to preparing and submitting his bid. The response from Weisz did list proposed equipment suppliers, but did not contain documentation *'from'* suppliers on equipment availability. The submittal did contain more detailed resumes, but did not contain information detailing the extent senior persons would be used on the job. The submittal did acknowledge a subcontractor to drill water wells. This clearly established that Weisz & Sons is planning to use a subcontractor and there-

fore failed to properly respond to Section B–1G in the initial bid proposal.

"Based upon the cumulative nature of the deficiencies noted, we concluded that the bid submitted by Weisz & Sons lack[ed] the minimum evidence required to be a responsive bid as required by Section C. We further conclude that these deficiencies reflect upon the bid being responsible. The bidder's accountability and overall understanding of the work being bid becomes an issue. We were further unable to thoroughly understand and evaluate the bidder[']s qualifications to do the work. Therefore, we recommend that the lowest bid, Weisz & Sons *be rejected.*

"Upon evaluation of the second low bidder's proposal (Eby Mine Services, Inc.), it was found that all information required by Sections B–1F and B–1G were provided and that through these submittals and our knowledge of Eby's previous work for this program, he appears qualified to conduct the work. We consider the second low bid to be responsive and responsible and recommend that you proceed with a notice to award the work to Eby Mine Services, Inc. at their bid of $1,775,375.00." (Bracketed material added. Emphasis in original.)

The Call for Bids, Section A, provided that

" * * * the contract, if awarded, shall be awarded to the bidder who, in the opinion of the Owner, is the lowest and most responsible and responsive bidder. *The OWNER reserves the right to reject any bid submitted without the 'Qualifications of Bidders' being fully and clearly set forth as required by item B–1F of the bid document."* (Emphasis added.)

Section B–1F of the bid document in pertinent part provided that

"[e]ach BIDDER shall provide written evidence of his capability to perform the work called for in the contract including the reclamation activities defined in Section I–3. This evidence shall include the following:

\* \* \* \* \* \*

"3. In the event that the BIDDER proposes to lease or otherwise acquire major equipment for the performance of this contract prior to the start of the contract, the BIDDER will additionally furnish for each such piece of equipment, details of the nature of the proposed acquisition, the proposed source of the equipment, the committed lead time for the supply of the equipment, and will provide as part of his bid, documentation from the proposed supplier of the equipment committing the availability of the equipment.

\* \* \* \* \* \*

"5. A personnel list for the project, including a summary of the experience of senior personnel who are proposed for the project, including: the project manager; the site supervisor(s); and the foremen. At a minimum this list shall include for each such senior person details of: the extent to which each person is to be used in the project * * *."

Section B–1G of the bid document provided that "[t]he prime CONTRACTOR shall attach to his Bid Proposal a list of all SUBCONTRACTORS and the dollar amount of work that said SUBCONTRACTOR will perform under this contract." Section B–1I of the bid document provided in pertinent part:

"The State of Wyoming reserves the unqualified right, in its sole and absolute discretion, to reject any and all bids, or to accept the base bid plus any, all or neither alternate bid specified, which in its sole and absolute judgement will, under all circumstances, best serve the public interest."

Section B–1J of the bid document provided in pertinent part:

"The intention of the State is to award this contract to the 'lowest qualified BIDDER.' In order to evaluate the bids the following process will be used:

"1. The Qualifications of BIDDERS will be evaluated using the materials provided as set out in Section B–1F to establish the BIDDERS that meet the

minimum requirements of being responsible and responsive."

## I

The testimony of the principal designer of the bid documents, a representative of Midwest Mining Company and the one who would be the state's representative and engineer on the project, was essentially consistent with the letter recommending rejection of the Weisz bid and acceptance of the Eby bid. His explanation of reasons for rejection appears reasonable to this Court and goes to the question of judgment.

The record transcript of the testimony of the Midwest Mining Company representative will be capsulized as briefly as possible. The bidder under Section B–1F3, supra, was required to provide, as part of his bid, documentation from the proposed supplier of the equipment committing the availability of the equipment. Weisz did not furnish such documentation with its bid. A telephone check with Weisz indicated such documents were not on hand at the time the bid was submitted. It is explained that a means of checking the ability of a contractor to meet the contract time limits is to examine the documentation to determine whether committed supplier of key pieces of equipment can deliver in time to meet time-of-performance limits. Particularly important were slurry pumps. No written commitment of any supplier was present with the Weisz bid. This left DEQ with the need to presume from the bid made any commitment of a supplier to Weisz was verbal. Experience had indicated such was not reliable—"notoriously optimistic"—and a written commitment was considered more reliable. Time of performance was particularly important because of the presence of two other contractors—hole drilling and material—whose time had to be coordinated with that of the slurry contractor. Other bidders who attached documentation showed six to fourteen weeks for slurry pump delivery, whereas the Weisz bid showed two weeks.

The trial judge in his opinion letter found that the "request in the specifications for such documentation has not been shown to be based upon any rational objective to be served in the interests of the owner in calling for bids" and was not a "material variance sufficient to reject the bid."

The second ground for rejection referred to Section B–1F5, supra, of the bid documents requiring the background and experience of "the project manager; the site supervisor(s); and the foremen." It also required details of the extent to which each such senior person was to be used in the project. The bid of Weisz contained the background and experience of the senior personnel but not the time they would be used on the project. The response was only that there would be "2 supervisory types on the job each day." A day was two shifts. It appeared from the evidence the two most experienced senior personnel would be on the job intermittently. Who the "supervisory types" were and who specifically would be on the site in charge were not disclosed.

The Midwest Mining Company engineer who will be on the job all the time testified that he needed to know, in evaluation of the bids, who he would be working with who would be in charge for the contractor, and that the engineer needed to have confidence in the individual to be disclosed in the documents. He testified that in a "field operation, there are continual breakdowns and problems which require qualified senior supervisor attention and monitoring and action." While the parties may have agreed *at the trial* that the personnel of Weisz were qualified, the Weisz bid up for evaluation was lacking in that information. We cannot see from the testimony of the project engineer that he was ever satisfied that Weisz personnel to be on the job were qualified or even authorized to speak for Weisz on important overall contract requirements. The trial judge, in the light of the understanding that the personnel were qualified, as he saw it, deemed the bid responsive. That hardly follows in view of the specific provision of the bid document, Section B–1J, supra, which explains that "[t]he [q]ualifications of the BIDDERS will

be evaluated using the materials provided as set out in Section B–1F" which required "details of: the extent to which each person is to be used in the project." Section B–1F5. Even after close examination of the transcript of testimony, we are unable to determine if Weisz would have qualified personnel on the site at all times, and who they were. They may have been qualified in their individual work but not as to the entire contract, which the engineer needed.

Item four [4] of reasons for rejection noted that Section B–1G required a list of subcontractors, but the Weisz bid contained none. The reasons for the requirement appear in the rejection advice memorandum, supra.

The question arose because nothing appears in the Weisz bid as to what provision it was making for the drilling of two required water wells to provide water for the slurry. An examination of the bid does not show well drilling equipment as owned or leased by Weisz.

At the time of bid opening, while the bids were still in the envelopes, Weisz discussed the water well drilling with Roger Russell, a well driller who was interested in the contract for drilling the holes through which the slurry would be injected into the underground voids. Russell testified that he was asked by Weisz if he was interested in drilling the water wells. He said he was interested if he got the hole drilling contract, otherwise he was not. Russell did not quote a price at the time but apparently has since given Weisz a price of $50 per foot or about $20,000 for drilling, plus the cost of pumps and other equipment. Twelve days after the bid opening, Weisz furnished information to DEQ that Russell would be the subcontractor to drill the water wells. Russell had been awarded the drilling contract on the Hanna project.

The trial judge laid aside the subcontractor requirement on the basis that the testimony *at trial* revealed that Weisz had obtained a commitment to lease [5] well drilling equipment from a well driller from Lusk and do the work itself, though that did not appear in the bid offer of Weisz. The trial court therefore found that there was no basis for a finding that the Weisz bid was not responsive.[6]

We additionally consider it important that the Call for Bids, Section A, scheduled a bidders' tour of the project at the site in Hanna to familiarize all bidders with the various locations and aspects of the work and answer questions in that regard. Weisz did not attend by sending a representative. It did, however, inspect the site on its own. Attendance at the bidders' tour was not required by the bid solicitation, but to us failure to attend indicates indifference on the part of the bidder. If it had had a representative at the tour, it may have adequately prepared its bid.

It seems then in sum that the trial court thought any lack of response or noncompliance with prescribed requirements of proposal forms by the low bidder was immaterial as long as the bidder could establish itself as qualified to do the work in the judgment of the court on the basis of post-award court proceedings. We are constrained to disagree.

## II

At the root of our decision is an underlying consideration of Article 2 of the Wyoming Constitution:

---

4. We will skip consideration of item three in that appellants at the trial abandoned any reliance on the matter of calibration of weighing equipment.

5. We note here that Section B–1F3 of the bid documents, supra, required that in the event the bidder proposed to lease major equipment, details of the acquisition, source, and committed lead time were to be supported by documentation from the proposed supplier. Such information did not appear in the Weisz bid.

6. In Florida, by statute, the contractor shall not remove or replace subcontractors listed in the bid subsequent to the list being made public at the bid opening, except upon good cause shown. Factors underlying the policy of listing subcontractors are prevention of bid shopping, protection of subcontractors, eliminating the advantage of late submission, and ensuring the integrity of the subcontractors' work. *E.M. Watkins & company v. Board of Regents*, Fla.App., 414 So.2d 583 (1982).

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

When a court, as part of the judicial branch, decides to step in and interfere with an action of the executive branch, it must somehow skirt around the forbidden territory under dominion of the executive branch. There is a very tightly circumscribed corridor through which the judiciary must pass before it can act to control representatives or agencies in their conduct of the state's business.

■ Early on this Court announced some of the principles by which a court is governed when entering the executive sector to explore and pass judgment on its management of the state's affairs. In *Bunten v. Rock Springs Grazing Association*, 29 Wyo. 461, 476, 215 P. 244 (1923), it was said that:

" * * * [I]n the absence of legislative provision to the contrary, courts cannot substitute their judgment for that of the persons and boards specifically provided for that purpose by the legislative department of our government, and no relief can be given by them in such cases in the absence of fraud, which invokes the principles of equity. Nor should this rule, announced by substantially all the courts of the land, be considered as a remarkable departure from any known principles. Many things, deemed unjust by a large or small proportion of the population, are done by, and happen under, other departments of our government, but are beyond the control of the courts. The judicial department has jurisdiction over acts that are illegally done, but to extend its power over acts done in

good faith, pursuant to the exercise of an honest judgment, and within the jurisdiction of the person or persons performing them, would be, in the absence of legislative authorization, judicial usurpation inconsistent with the fundamental constitutional principle of division of power. * * * "

To DAFC has been delegated the duty of contracting on behalf of the state. No authority has been given to the courts to do this for it. When the district court enjoined the granting of the contract to any other than Weisz, it assumed the role of contracting delegated to DAFC within the executive branch.

■ This Court in years past has consistently held that courts are warranted in setting aside action of an administrative agency only where its action is arbitrary or fraudulent or where there is an illegal exercise of discretion. *Bixby v. Cross*, Wyo., 384 P.2d 710 (1963); *Marathon Oil Company v. Welch*, Wyo., 379 P.2d 832 (1963). *Banzhaf v. Swan Company*, 60 Wyo. 201, 148 P.2d 225 (1944), approved *Miller v. Hurley*, 37 Wyo. 344, 262 P. 238 (1927). In *Miller*, when it was contended that the court must grant a lease of state lands to one or the other of the parties, this Court responded by saying it had no power to lease state lands but that such power was vested in the state land board which had wide discretion. The Court went on to comment that if that discretion by means of a simple lawsuit and an appeal can be taken away from the board and vested in the district court, then the discretion of the land board amounts to nothing; it is an empty thing—a delusion—its discretion is wiped out. Miller held that the agency's discretion should be controlling except in the case of an illegal exercise thereof or in case of fraud or grave abuse of such discretion.[7] The burden is on the complainant of proving that the agency's action is an illegal exercise of discretion, arbitrary or

---

7. Other Wyoming cases enunciating the same doctrine as those cited in this paragraph are: *Bucknum v. Johnson*, 21 Wyo. 26, 127 P. 904 (1912); *Baker v. Brown*, 12 Wyo. 198, 74 P. 94 (1903); *Cooper v. McCormick*, 10 Wyo. 379, 69 P. 301 (1902); *State ex rel. Marsh v. State Board of Land Commissioners*, 7 Wyo. 478, 53 P. 292 (1898).

fraudulent. *Wyoming Bancorporation v. Bonham,* Wyo., 527 P.2d 432 (1974); *Marathon Oil Company v. Welch,* supra.

Running through those cases we find words of description such as dishonesty, bad faith, illegality, and oppressiveness on the part of the agency. The term "abuse of discretion" in its application to agency conduct carries with it a connotation of illegal and other conduct smacking of censurable behavior, justifying judicial intervention.

■ We are unable to find from the statutes, applicable case law, rules and regulations, and the record on appeal that the procedures followed by DAFC and DEQ in seeking bids and awarding the contract to be any other than lawful, reasonable, and in the exercise of honest judgment, good faith, and accepted competitive bid practices. Under those circumstances, the judiciary of this state cannot interfere and substitute its judgment for that of the responsible agency or perform the duties properly belonging to DAFC in the awarding of a contract.

■ W.S. 9–2–1016(b)(xiv)(A) directs that competitive sealed bidding shall be utilized so as to permit award of a contract on the basis of the "lowest *evaluated* price" (emphasis added) determined in accordance with "objective, measurable criteria set forth in the invitation for bids." DAFC's call for bids provided in Section B–1F that specific written evidence of capability to perform the work be furnished and, in particular in question here, that documentation to establish availability be furnished by the supplier of equipment. Also required were a list of senior personnel and details as to the extent that person or those persons were to be used in the project, a list of subcontractors with dollar amount of work, and list of persons who would furnish leased equipment and its availability. Bidders were advised by the bid documents that "[q]ualifications of BIDDERS will be *evaluated using the materials provided* as set out in Section B–1F to establish the BIDDERS that meet the minimum requirements of being responsible and respon-

sive." (Emphasis added.) Behind the bid specifications were a legitimate material reason and a purpose. They were not idle requirements but designed to create a basis for evaluation. Weisz nevertheless failed to provide that information in its bid. DEQ evaluated the bids as required by statute using the measurable criteria set out. It did so openly after notice to bidders of the method to be followed. There was no underhanded, dishonest or bad-faith behavior by its personnel, and it followed the law to the letter.

Other circumstances such as the failure of Weisz to appear at the bidders' tour of the project (though not required) and submission of a bid response that, to the project engineer, appeared to have been hastily drawn may have influenced the judgment of the bid evaluators. The combination of those circumstances, and failure to supply the requested documentation making the bid irresponsive, could well demonstrate an attitude of indifference and cast a shadow on the responsibility of the low bidder. We are satisfied that these are matters of judgment with which the judicial branch may not interfere. The judicial branch has no authority to award contracts; that rests within the executive branch of government, and DAFC, with the advice of DEQ, in particular in this case.

We would add that the call for bids reserved the right to reject *any* bid submitted without the qualifications of the bidder being fully and clearly set forth as required by Section B–1F of the bid document. Call for Bids, Section A, supra. Bidders were not misled. If a bidder chooses to ignore bid requirements and it has approval of the judiciary, then that constitutes active interference with the executive branch and nullifies the competitive bid process, taking away the usefulness of measurable criteria required by the legislature.

■ It is the responsibility of the public agency, which is charged with contracting, to accept that bid which, in its judgment, would provide the best project for the mon-

ey. Inherent to its duties, presumed superior knowledge, and expertise, the responsible public authority must have wide latitude in which to exercise its judgment as to the best means of accomplishing that objective, and courts are reluctant to enjoin such administrative functions in the absence of dishonesty, fraud, collusion, or lack of good faith. *Clayton v. Salt Lake City*, 15 Utah 2d 57, 387 P.2d 93 (1963). The money amount of the bid is not the sole criteria. There must also be conformity with the bidding specifications. *Albert F. Ruehl Co. v. Board of Trustees of Schools for Industrial Education*, 85 N.J.Super. 4, 203 A.2d 410 (1964); *Township of Hillside v. Sternin*, 25 N.J. 317, 136 A.2d 265 (1957).

■ It is a general rule that bids for public contracts must substantially comply with the requirements of the specifications for bidding and the directions to prospective bidders. The determination as to whether these requirements are satisfied and the awarding of a contract are acts of discretion which will be enjoined only if done illegally, arbitrarily, capriciously, or unreasonably. *Gridley v. Engelhart*, S.D., 322 N.W.2d 3 (1982); *Conduit and Foundation Corporation v. City of Philadelphia*, 41 Pa.Cmwlth. 641, 401 A.2d 376 (1979); *Bud Johnson Construction Co., Inc. v. Metropolitan Transit Commission*, Minn., 272 N.W.2d 31 (1978); *LeCesse Bros. Contracting, Inc. v. Town Board of Town of Williamson*, 62 App.Div.2d 28, 403 N.Y.S.2d 950 (1978); *Kelly v. Zamarello*, Alaska, 486 P.2d 906 (1971); *Wester v. Belote*, 103 Fla. 976, 138 So. 721 (1931); *Maryland Pavement Co. of Baltimore City v. Mahool*, 110 Md. 397, 72 A. 833 (1909). We find this rule to be within the perimeter of Wyoming precedent.[8]

A potential contractor is free not to bid if it is dissatisfied with bidding requirements. No useful purpose would be served if a bidder can ignore the bidding specifica-

tions. One who chooses his own course is in effect no bidder at all.

The reason for the rule is expressed in *Inn Operations v. River Hills Motor Inn Company*, 261 Iowa 72, 152 N.W.2d 808, 817 (1967):

"Public policy underlies the requirements of competitive bidding. The purpose of the statute is that each bidder, actual or possible, shall be put upon the same footing. * * * If any bidder is relieved from conforming to the conditions which impose some duty upon him, or from strict performance of the terms of the invitation to bid, such bidder is not contracting in fair competition with those bidders who propose to be bound by all conditions. * * * "

In *Superior Oil Company v. Udall*, 409 F.2d 1115, 133 U.S.App.D.C. 198 (D.C.Cir. 1969), in an opinion by now Chief Justice Burger, the court emphasized the importance of strict compliance with bidding requirements and quoted with approval from an opinion by the comptroller general:

" '[T]he strict maintenance of the competitive bidding procedures required by law is infinitely more in the public interest *than obtaining a pecuniary advantage in individual cases by permitting practices which do violence to the spirit and purpose of the law. * * * '* '* " (Emphasis in original.) 409 F.2d at 1119–1120.

The court went on to say:

"The requirement of steadfast compliance with competitive bidding procedures * * * is an indispensable ingredient to the maintenance of competitive bidding processes which will engender public confidence and that of persons dealing with the Government." 409 F.2d at 1120.

To permit a court to override the discretion of DAFC and DEQ in their respective roles of being charged with selecting a contractor to inject slurry, under the circumstances of this case, would destroy the competi-

---

**8.** We have considered *Centric Corporation v. Barbarossa & Sons, Inc.*, Wyo., 521 P.2d 874 (1974). It appears to stand alone in Wyoming jurisprudence. We agree with its denial of an injunction but otherwise find that it furnishes no guidelines of value in disposition of the appeal now before us. Its holding must be closely confined to its specific facts which are not comparable to those now before us.

 

tive nature of the bidding process and render the bidding specifications a nullity.

The project engineer for DEQ spent several months examining and surveying the project site, in drafting plans and specifications, and in dividing up the total project into three phases of hole drilling, material and slurry injection, with each phase having to be closely coordinated with the others. Based on that, the bidding documents were prepared. DEQ was well aware of its needs and what was required to accomplish the necessary work. It was the agency which was responsible for the contracts being effectively performed and the state and federal governments getting their money's worth. Its requirements for a bid proposal were rationally designed around a goal of efficiency and close coordination by the participating contractors. Preparation of the bidding documents, evaluating the proposals, and awarding the contracts were all matters within the expertise of DEQ and its professional engineers employed to do what they did in discharging their responsibility. DAFC relied upon that expertise in awarding the slurry contract.

To plunge the courts into the evaluation process of bidding and awarding of contracts will lead to interminal delays. The judicial process does not lend itself to the solution of such problems. In those administrative functions entrusted to state agencies giving rise to litigation, courts should confine themselves to the interpretation of statutes, rules, regulations, contracts, and documents within their competence and with which courts regularly deal and have specialized knowledge and experience.

We hold that DAFC and DEQ were not guilty of fraud, acting arbitrarily, or engaging in the illegal exercise of discretion. They were honestly, fairly, and in good faith performing their statutory duties. We further hold that under the facts of this case, the trial judge should have deferred to the judgment and discretion of

9. This opinion confirms and explains the order of reversal and vacation of injunction entered

DAFC and DEQ and had no authority to award a contract.[9]

Reversed.